# LANDGRAF *v.* USI FILM PRODUCTS ET AL.

No. 92–757.   Argued October 13, 1993—Decided April 26, 1994

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined, *post,* p. 286. BLACKMUN, J., filed a dissenting opinion, *post,* p. 294.

*Eric Schnapper* argued the cause for petitioner. On the briefs were *Paul C. Saunders, Timothy B. Garrigan, Richard T. Seymour,* and *Sharon R. Vinick.*

*Solicitor General Days* argued the cause for the United States et al. as *amici curiae* urging reversal. On the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Turner, Deputy Solicitor General Wallace, Robert A. Long, Jr., David K. Flynn, Dennis J. Dimsey, Rebecca K. Troth,* and *Donald R. Livingston.*

*Glen D. Nager* argued the cause for respondents. On the brief was *David N. Shane.*[*]

JUSTICE STEVENS delivered the opinion of the Court.

The Civil Rights Act of 1991 (1991 Act or Act) creates a right to recover compensatory and punitive damages for certain violations of Title VII of the Civil Rights Act of 1964. See Rev. Stat. § 1977A(a), 42 U. S. C. § 1981a(a) (1988 ed., Supp. IV), as added by § 102 of the 1991 Act, Pub. L. 102–166, 105 Stat. 1072. The Act further provides that any party may demand a trial by jury if such damages are sought.[1] We granted certiorari to decide whether these provisions apply to a Title VII case that was pending on appeal when the statute was enacted. We hold that they do not.

I

From September 4, 1984, through January 17, 1986, petitioner Barbara Landgraf was employed in the USI Film

---

[*]Briefs of *amici curiae* urging reversal were filed for the Asian American Legal Defense and Education Fund et al. by *Denny Chin, Doreena Wong,* and *Angelo N. Ancheta;* and for the National Women's Law Center et al. by *Judith E. Schaeffer* and *Ellen J. Vargyas.*

Briefs of *amici curiae* urging affirmance were filed for the American Trucking Associations et al. by *James D. Holzhauer, Andrew L. Frey, Kenneth S. Geller, Javier H. Rubinstein, Daniel R. Barney,* and *Kenneth P. Kolson;* and for Motor Express, Inc., by *Alan J. Thiemann.*

Briefs of *amici curiae* were filed for the Equal Employment Advisory Council et al. by *Robert E. Williams, Douglas S. McDowell,* and *Mona C. Zeiberg;* for the National Association for the Advancement of Colored People et al. by *Marc L. Fleischaker, David L. Kelleher, Steven S. Zaleznick, Cathy Ventrell-Monsees, Steven M. Freeman, Michael Lieberman, Dennis Courtland Hayes, Willie Abrams, Samuel Rabinove,* and *Richard Foltin;* and for Wards Cove Packing Co. by *Douglas M. Fryer, Douglas M. Duncan,* and *Richard L. Phillips.*

[1]See Rev. Stat. § 1977A(c), 42 U. S. C. § 1981a(c) (1988 ed., Supp. IV), as added by § 102 of the 1991 Act. For simplicity, and in conformity with the practice of the parties, we will refer to the damages and jury trial provisions as §§ 102(a) and (c), respectively.

Products (USI) plant in Tyler, Texas. She worked the 11 p.m. to 7 a.m. shift operating a machine that produced plastic bags. A fellow employee named John Williams repeatedly harassed her with inappropriate remarks and physical contact. Petitioner's complaints to her immediate supervisor brought her no relief, but when she reported the incidents to the personnel manager, he conducted an investigation, reprimanded Williams, and transferred him to another department. Four days later petitioner quit her job.

Petitioner filed a timely charge with the Equal Employment Opportunity Commission (EEOC or Commission). The Commission determined that petitioner had likely been the victim of sexual harassment creating a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, but concluded that her employer had adequately remedied the violation. Accordingly, the Commission dismissed the charge and issued a notice of right to sue.

On July 21, 1989, petitioner commenced this action against USI, its corporate owner, and that company's successor in interest.[2] After a bench trial, the District Court found that Williams had sexually harassed petitioner causing her to suffer mental anguish. However, the court concluded that she had not been constructively discharged. The court said:

> "Although the harassment was serious enough to establish that a hostile work environment existed for Landgraf, it was not so severe that a reasonable person would have felt compelled to resign. This is particularly true in light of the fact that at the time Landgraf resigned from her job, USI had taken steps . . . to eliminate the hostile working environment arising from the sexual harassment. Landgraf voluntarily resigned

---

[2] Respondent Quantum Chemical Corporation owned the USI plant when petitioner worked there. Respondent Bonar Packaging, Inc., subsequently purchased the operation.

from her employment with USI for reasons unrelated to the sexual harassment in question." App. to Pet. for Cert. B-3-4.

Because the court found that petitioner's employment was not terminated in violation of Title VII, she was not entitled to equitable relief, and because Title VII did not then authorize any other form of relief, the court dismissed her complaint.

On November 21, 1991, while petitioner's appeal was pending, the President signed into law the Civil Rights Act of 1991. The Court of Appeals rejected petitioner's argument that her case should be remanded for a jury trial on damages pursuant to the 1991 Act. Its decision not to remand rested on the premise that "a court must 'apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.' *Bradley* [v. *School Bd. of Richmond*, 416 U. S. 696, 711 (1974)]." 968 F. 2d 427, 432 (CA5 1992). Commenting first on the provision for a jury trial in § 102(c), the court stated that requiring the defendant "to retry this case because of a statutory change enacted after the trial was completed would be an injustice and a waste of judicial resources. We apply procedural rules to pending cases, but we do not invalidate procedures followed before the new rule was adopted." *Id.*, at 432–433. The court then characterized the provision for compensatory and punitive damages in § 102 as "a seachange in employer liability for Title VII violations" and concluded that it would be unjust to apply this kind of additional and unforeseeable obligation to conduct occurring before the effective date of the Act. *Id.*, at 433. Finding no clear error in the District Court's factual findings, the Court of Appeals affirmed the judgment for respondents.

We granted certiorari and set the case for argument with *Rivers* v. *Roadway Express, Inc., post,* p. 298. Our order limited argument to the question whether § 102 of the 1991

Act applies to cases pending when it became law. 507 U. S. 908 (1993). Accordingly, for purposes of our decision, we assume that the District Court and the Court of Appeals properly applied the law in effect at the time of the discriminatory conduct and that the relevant findings of fact were correct. We therefore assume that petitioner was the victim of sexual harassment violative of Title VII, but that the law did not then authorize any recovery of damages even though she was injured. We also assume, *arguendo*, that if the same conduct were to occur today, petitioner would be entitled to a jury trial and that the jury might find that she was constructively discharged, or that her mental anguish or other injuries would support an award of damages against her former employer. Thus, the controlling question is whether the Court of Appeals should have applied the law in effect at the time the discriminatory conduct occurred, or at the time of its decision in July 1992.

## II

Petitioner's primary submission is that the text of the 1991 Act requires that it be applied to cases pending on its enactment. Her argument, if accepted, would make the entire Act (with two narrow exceptions) applicable to conduct that occurred, and to cases that were filed, before the Act's effective date. Although only § 102 is at issue in this case, we preface our analysis with a brief description of the scope of the 1991 Act.

The 1991 Act is in large part a response to a series of decisions of this Court interpreting the Civil Rights Acts of 1866 and 1964. Section 3(4), 105 Stat. 1071, note following 42 U. S. C. § 1981, expressly identifies as one of the Act's purposes "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." That section, as well as a specific finding in § 2(2), identifies *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642

(1989), as a decision that gave rise to special concerns.[3]   Section 105 of the Act, entitled "Burden of Proof in Disparate Impact Cases," is a direct response to *Wards Cove.*

Other sections of the Act were obviously drafted with "recent decisions of the Supreme Court" in mind.   Thus, § 101 (which is at issue in *Rivers, post,* p. 298) amended the 1866 Civil Rights Act's prohibition of racial discrimination in the "mak[ing] and enforce[ment] [of] contracts," 42 U. S. C. § 1981 (1988 ed., Supp. IV), in response to *Patterson* v. *McLean Credit Union,* 491 U. S. 164 (1989); § 107 responds to *Price Waterhouse* v. *Hopkins,* 490 U. S. 228 (1989), by setting forth standards applicable in "mixed motive" cases; § 108 responds to *Martin* v. *Wilks,* 490 U. S. 755 (1989), by prohibiting certain challenges to employment practices implementing consent decrees; § 109 responds to *EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244 (1991), by redefining the term "employee" as used in Title VII to include certain United States citizens working in foreign countries for United States employers; § 112 responds to *Lorance* v. *AT&T Technologies, Inc.,* 490 U. S. 900 (1989), by expanding employees' rights to challenge discriminatory seniority systems; § 113 responds to *West Virginia Univ. Hospitals, Inc.* v. *Casey,* 499 U. S. 83 (1991), by providing that an award of attorney's fees may include expert fees; and § 114 responds to *Library of Congress* v. *Shaw,* 478 U. S. 310 (1986), by allowing interest on judgments against the United States.

A number of important provisions in the Act, however, were not responses to Supreme Court decisions.   For example, § 106 enacts a new prohibition against adjusting test

---

[3] Section 2(2) finds that the *Wards Cove* decision "has weakened the scope and effectiveness of Federal civil rights protections," and § 3(2) expresses Congress' intent "to codify" certain concepts enunciated in "Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio, 490 U. S. 642 (1989)."   We take note of the express references to that case because it is the focus of § 402(b), on which petitioner places particular reliance.   See *infra,* at 258–263.

scores "on the basis of race, color, religion, sex, or national origin"; § 117 extends the coverage of Title VII to include the House of Representatives and certain employees of the Legislative Branch; and §§ 301–325 establish special procedures to protect Senate employees from discrimination. Among the provisions that did not directly respond to any Supreme Court decision is the one at issue in this case, § 102.

Entitled "Damages in Cases of Intentional Discrimination," § 102 provides in relevant part:

"(a) Right of Recovery.—

"(1) Civil Rights.—In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U. S. C. 2000e–5) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U. S. C. 2000e–2 or 2000e–3), and provided that the complaining party cannot recover under section 1977 of the Revised Statutes (42 U. S. C. 1981), the complaining party may recover compensatory and punitive damages . . . in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

. . . . .

"(c) Jury Trial.—If a complaining party seeks compensatory or punitive damages under this section—

"(1) any party may demand a trial by jury."

Before the enactment of the 1991 Act, Title VII afforded only "equitable" remedies. The primary form of monetary relief available was backpay.[4]  Title VII's backpay rem-

---

. [4] We have not decided whether a plaintiff seeking backpay under Title VII is entitled to a jury trial.  See, e. g., Lytle v. Household Mfg., Inc., 494 U. S. 545, 549, n. 1 (1990) (assuming without deciding no right to jury trial); Teamsters v. Terry, 494 U. S. 558, 572 (1990) (same).  Because peti-

edy,[5] modeled on that of the National Labor Relations Act, 29 U. S. C. § 160(c), is a "make-whole" remedy that resembles compensatory damages in some respects. See *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 418–422 (1975). However, the new compensatory damages provision of the 1991 Act is "in addition to," and does not replace or duplicate, the back-pay remedy allowed under prior law. Indeed, to prevent double recovery, the 1991 Act provides that compensatory damages "shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964." § 102(b)(2).

Section 102 significantly expands the monetary relief potentially available to plaintiffs who would have been entitled to backpay under prior law. Before 1991, for example, monetary relief for a discriminatorily discharged employee generally included "only an amount equal to the wages the employee would have earned from the date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation pay and pension benefits." *United States* v. *Burke*, 504 U. S. 229, 239 (1992). Under § 102, however, a Title VII plaintiff who wins a backpay award may also seek compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." § 102(b)(3). In ad-

---

tioner does not argue that she had a right to jury trial even under pre-1991 law, again we need not address this question.

[5] "If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice charged in the complaint, the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." Civil Rights Act of 1964, § 706(g), as amended, 42 U. S. C. § 2000e–5(g) (1988 ed., Supp. IV).

dition, when it is shown that the employer acted "with malice or with reckless indifference to the [plaintiff's] federally protected rights," § 102(b)(1), a plaintiff may recover punitive damages.[6]

Section 102 also allows monetary relief for some forms of workplace discrimination that would not previously have justified *any* relief under Title VII. As this case illustrates, even if unlawful discrimination was proved, under prior law a Title VII plaintiff could not recover monetary relief unless the discrimination was also found to have some concrete effect on the plaintiff's employment status, such as a denied promotion, a differential in compensation, or termination. See *Burke*, 504 U. S., at 240. ("[T]he circumscribed remedies available under Title VII [before the 1991 Act] stand in marked contrast not only to those available under traditional tort law, but under other federal anti-discrimination statutes, as well"). Section 102, however, allows a plaintiff to recover in circumstances in which there has been unlawful discrimination in the "terms, conditions, or privileges of employment," 42 U. S. C. § 2000e–2(a)(1),[7] even though the discrimination did not involve a discharge or a loss of pay. In short, to further Title VII's "central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination," *Albemarle Paper Co.*, 422 U. S., at 421, § 102 of the

---

[6] Section 102(b)(3) imposes limits, varying with the size of the employer, on the amount of compensatory and punitive damages that may be awarded to an individual plaintiff. Thus, the sum of such damages awarded a plaintiff may not exceed $50,000 for employers with between 14 and 100 employees; $100,000 for employers with between 101 and 200 employees; $200,000 for employers with between 200 and 500 employees; and $300,000 for employers with more than 500 employees.

[7] See *Harris* v. *Forklift Systems, Inc.*, 510 U. S. 17, 21 (1993) (discrimination in "terms, conditions, or privileges of employment" actionable under Title VII "is not limited to 'economic' or 'tangible' discrimination") (citations and internal quotation marks omitted).

1991 Act effects a major expansion in the relief available to victims of employment discrimination.

In 1990, a comprehensive civil rights bill passed both Houses of Congress. Although similar to the 1991 Act in many other respects, the 1990 bill differed in that it contained language expressly calling for application of many of its provisions, including the section providing for damages in cases of intentional employment discrimination, to cases arising before its (expected) enactment.[8] The President ve-

---

[8] The relevant section of the Civil Rights Act of 1990, S. 2104, 101st Cong., 1st Sess. (1990), provided:

"SEC. 15. APPLICATION OF AMENDMENTS AND TRANSITION RULES.

"(a) APPLICATION OF AMENDMENTS.—The amendments made by—

"(1) section 4 shall apply to all proceedings pending on or commenced after June 5, 1989 [the date of *Wards Cove Packing Co.* v. *Atonio,* 490 U. S. 642];

"(2) section 5 shall apply to all proceedings pending on or commenced after May 1, 1989 [the date of *Price Waterhouse* v. *Hopkins,* 490 U. S. 228];

"(3) section 6 shall apply to all proceedings pending on or commenced after June 12, 1989 [the date of *Martin* v. *Wilks,* 490 U. S. 755];

"(4) sections 7(a)(1), 7(a)(3) and 7(a)(4), 7(b), 8 [providing for compensatory and punitive damages for intentional discrimination], 9, 10, and 11 shall apply to all proceedings pending on or commenced after the date of enactment of this Act;

"(5) section 7(a)(2) shall apply to all proceedings pending on or after June 12, 1989 [the date of *Lorance* v. *AT&T Technologies, Inc.,* 490 U. S. 900]; and

"(6) section 12 shall apply to all proceedings pending on or commenced after June 15, 1989 [the date of *Patterson* v. *McLean Credit Union,* 491 U. S. 164].

"(b) TRANSITION RULES.—

"(1) IN GENERAL.—Any orders entered by a court between the effective dates described in subsection (a) and the date of enactment of this Act that are inconsistent with the amendments made by sections 4, 5, 7(a)(2), or 12, shall be vacated if, not later than 1 year after such date of enactment, a request for such relief is made.

.        .        .        .        .

"(3) FINAL JUDGMENTS.—Pursuant to paragraphs (1) and (2), any final judgment entered prior to the date of the enactment of this Act as to which the rights of any of the parties thereto have become fixed and

toed the 1990 legislation, however, citing the bill's "unfair retroactivity rules" as one reason for his disapproval.[9] Congress narrowly failed to override the veto. See 136 Cong. Rec. S16589 (Oct. 24, 1990) (66 to 34 Senate vote in favor of override).

The absence of comparable language in the 1991 Act cannot realistically be attributed to oversight or to unawareness of the retroactivity issue. Rather, it seems likely that one of the compromises that made it possible to enact the 1991 version was an agreement *not* to include the kind of explicit retroactivity command found in the 1990 bill.

The omission of the elaborate retroactivity provision of the 1990 bill—which was by no means the only source of political controversy over that legislation—is not dispositive because it does not tell us precisely where the compromise was struck in the 1991 Act. The Legislature might, for example, have settled in 1991 on a less expansive form of retroactivity that, unlike the 1990 bill, did not reach cases already finally decided. See n. 8, *supra.* A decision to reach only cases still pending might explain Congress' failure to provide in the

---

vested, where the time for seeking further judicial review of such judgment has otherwise expired pursuant to title 28 of the United States Code, the Federal Rules of Civil Procedure, and the Federal Rules of Appellate Procedure, shall be vacated in whole or in part if justice requires pursuant to rule 60(b)(6) of the Federal Rules of Civil Procedure or other appropriate authority, and consistent with the constitutional requirements of due process of law."

[9] See President's Message to the Senate Returning Without Approval the Civil Rights Act of 1990, 26 Weekly Comp. Pres. Doc. 1632–1634 (Oct. 22, 1990), reprinted in 136 Cong. Rec. S16418, S16419 (Oct. 22, 1990). The President's veto message referred to the bill's "retroactivity" only briefly; the Attorney General's Memorandum to which the President referred was no more expansive, and may be read to refer only to the bill's special provision for reopening final judgments, see n. 8, *supra,* rather than its provisions covering pending cases. See Memorandum of the Attorney General to the President (Oct. 22, 1990) in App. to Brief for Petitioner A–13 ("And Section 15 unfairly applies the changes in the law made by S. 2104 to *cases already decided*") (emphasis added).

1991 Act, as it had in 1990, that certain sections would apply to proceedings pending on specific preenactment dates.   Our first question, then, is whether the statutory text on which petitioner relies manifests an intent that the 1991 Act should be applied to cases that arose and went to trial before its enactment.

### III

Petitioner's textual argument relies on three provisions of the 1991 Act: §§ 402(a), 402(b), and 109(c).   Section 402(a), the only provision of the Act that speaks directly to the question before us, states:

> "Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment."

That language does not, by itself, resolve the question before us.   A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.[10]

---

[10] The history of prior amendments to Title VII suggests that the "effective-upon-enactment" formula would have been an especially inapt way to reach pending cases.   When it amended Title VII in the Equal Employment Opportunity Act of 1972, Congress explicitly provided:

"The amendments made by this Act to section 706 of the Civil Rights Act of 1964 shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act and all charges filed thereafter."   Pub. L. 92–261, § 14, 86 Stat. 113.   In contrast, in amending Title VII to bar discrimination on the basis of pregnancy in 1978, Congress provided:

"Except as provided in subsection (b), the amendment made by this Act shall be effective on the date of enactment."   § 2(a), 92 Stat. 2076.

The only Courts of Appeals to consider whether the 1978 amendments applied to pending cases concluded that they did not.   See *Schwabenbauer* v. *Board of Ed. of School Dist. of Olean*, 667 F. 2d 305, 310, n. 7 (CA2 1981); *Condit* v. *United Air Lines, Inc.*, 631 F. 2d 1136, 1139–1140 (CA4 1980).   See also *Jensen* v. *Gulf Oil Refining & Marketing Co.*, 623 F. 2d 406, 410 (CA5 1980) (Age Discrimination in Employment Act amendments designated to "take effect on the date of enactment of this Act" inapplica-

Petitioner does not argue otherwise. Rather, she contends that the introductory clause of § 402(a) would be superfluous unless it refers to §§ 402(b) and 109(c), which provide for prospective application in limited contexts.

The parties agree that § 402(b) was intended to exempt a single disparate impact lawsuit against the Wards Cove Packing Company. Section 402(b) provides:

> "(b) CERTAIN DISPARATE IMPACT CASES.—Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983."

Section 109(c), part of the section extending Title VII to overseas employers, states:

> "(c) APPLICATION OF AMENDMENTS.—The amendments made by this section shall not apply with respect to conduct occurring before the date of the enactment of this Act."

According to petitioner, these two subsections are the "other provisions" contemplated in the first clause of § 402(a), and together create a strong negative inference that all sections of the Act not specifically declared prospective apply to pending cases that arose before November 21, 1991.

Before addressing the particulars of petitioner's argument, we observe that she places extraordinary weight on two comparatively minor and narrow provisions in a long and complex statute. Applying the entire Act to cases arising from preenactment conduct would have important consequences, including the possibility that trials completed before its en-

---

ble to case arising before enactment); *Sikora* v. *American Can Co.*, 622 F. 2d 1116, 1119–1124 (CA3 1980) (same). If we assume that Congress was familiar with those decisions, cf. *Cannon* v. *University of Chicago*, 441 U. S. 677, 698–699 (1979), its choice of language in § 402(a) would imply nonretroactivity.

actment would need to be retried and the possibility that employers would be liable for punitive damages for conduct antedating the Act's enactment. Purely prospective application, on the other hand, would prolong the life of a remedial scheme, and of judicial constructions of civil rights statutes, that Congress obviously found wanting. Given the high stakes of the retroactivity question, the broad coverage of the statute, and the prominent and specific retroactivity provisions in the 1990 bill, it would be surprising for Congress to have chosen to resolve that question through negative inferences drawn from two provisions of quite limited effect.

Petitioner, however, invokes the canon that a court should give effect to every provision of a statute and thus avoid redundancy among different provisions. See, *e. g., Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837, and n. 11 (1988). Unless the word "otherwise" in § 402(a) refers to either § 402(b) or § 109(c), she contends, the first five words in § 402(a) are entirely superfluous. Moreover, relying on the canon *"[e]xpressio unius est exclusio alterius,"* see *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U. S. 163, 168 (1993), petitioner argues that because Congress provided specifically for prospectivity in two places (§§ 109(c) and 402(b)), we should infer that it intended the opposite for the remainder of the statute.

Petitioner emphasizes that § 402(a) begins: "Except as otherwise specifically provided." A scan of the statute for other "specific provisions" concerning effective dates reveals that §§ 402(b) and 109(c) are the most likely candidates. Since those provisions decree prospectivity, and since § 402(a) tells us that the specific provisions are *exceptions*, § 402(b) should be considered as prescribing a general rule of retroactivity. Petitioner's argument has some force, but we find it most unlikely that Congress intended the introductory clause to carry the critically important meaning petitioner assigns it. Had Congress wished § 402(a) to have such a de-

terminate meaning, it surely would have used language comparable to its reference to the predecessor Title VII damages provisions in the 1990 legislation: that the new provisions "shall apply to all proceedings pending on or commenced after the date of enactment of this Act." S. 2104, 101st Cong., 1st Sess. § 15(a)(4) (1990).

It is entirely possible that Congress inserted the "otherwise specifically provided" language not because it understood the "takes effect" clause to establish a rule of retroactivity to which only two "other specific provisions" would be exceptions, but instead to assure that any specific timing provisions in the Act would prevail over the general "take effect on enactment" command. The drafters of a complicated piece of legislation containing more than 50 separate sections may well have inserted the "except as otherwise provided" language merely to avoid the risk of an inadvertent conflict in the statute.[11] If the introductory clause of § 402(a) was intended to refer specifically to §§ 402(b), 109(c), or both, it is difficult to understand why the drafters chose the word "otherwise" rather than either or both of the appropriate section numbers.

We are also unpersuaded by petitioner's argument that both §§ 402(b) and 109(c) merely duplicate the "take effect upon enactment" command of § 402(a) unless all other provisions, including the damages provisions of § 102, apply to pending cases. That argument depends on the assumption that all those other provisions must be treated uniformly for purposes of their application to pending cases based on preenactment conduct. That thesis, however, is by no

---

[11] There is some evidence that the drafters of the 1991 Act did not devote particular attention to the interplay of the Act's "effective date" provisions. Section 110, which directs the EEOC to establish a "Technical Assistance Training Institute" to assist employers in complying with antidiscrimination laws and regulations, contains a subsection providing that it "shall take effect on the date of the enactment of this Act." § 110(b). That provision and § 402(a) are unavoidably redundant.

means an inevitable one. It is entirely possible—indeed, highly probable—that, because it was unable to resolve the retroactivity issue with the clarity of the 1990 legislation, Congress viewed the matter as an open issue to be resolved by the courts. Our precedents on retroactivity left doubts about what default rule would apply in the absence of congressional guidance, and suggested that some provisions might apply to cases arising before enactment while others might not.[12] Compare *Bowen* v. *Georgetown Univ. Hospital,* 488 U. S. 204 (1988), with *Bradley* v. *School Bd. of Richmond,* 416 U. S. 696 (1974). See also *Bennett* v. *New Jersey,* 470 U. S. 632 (1985). The only matters Congress did *not* leave to the courts were set out with specificity in §§ 109(c) and 402(b). Congressional doubt concerning judicial retroactivity doctrine, coupled with the likelihood that the routine "take effect upon enactment" language would require courts to fall back upon that doctrine, provide a plausible explanation for both §§ 402(b) and 109(c) that makes neither provision redundant.

Turning to the text of § 402(b), it seems unlikely that the introductory phrase ("Notwithstanding any other provision of this Act") was meant to refer to the immediately preceding subsection. Since petitioner does not contend that any *other* provision speaks to the general effective date issue, the logic of her argument requires us to interpret that phrase to mean nothing more than "Notwithstanding § 402(a)." Petitioner's textual argument assumes that the drafters selected the indefinite word "otherwise" in § 402(a) to identify two

---

[12] This point also diminishes the force of petitioner's *"expressio unius"* argument. Once one abandons the unsupported assumption that Congress expected that all of the Act's provisions would be treated alike, and takes account of uncertainty about the applicable default rule, §§ 109(c) and 402(b) do not carry the negative implication petitioner draws from them. We do not read either provision as doing anything more than definitively rejecting retroactivity with respect to the specific matters covered by its plain language.

specific subsections and the even more indefinite term "any other provision" in §402(b) to refer to nothing more than §402(b)'s next-door neighbor—§402(a). Here again, petitioner's statutory argument would require us to assume that Congress chose a surprisingly indirect route to convey an important and easily expressed message concerning the Act's effect on pending cases.

The relevant legislative history of the 1991 Act reinforces our conclusion that §§402(a), 109(c), and 402(b) cannot bear the weight petitioner places upon them. The 1991 bill as originally introduced in the House contained explicit retroactivity provisions similar to those found in the 1990 bill.[13] However, the Senate substitute that was agreed upon omitted those explicit retroactivity provisions.[14] The legislative history discloses some frankly partisan statements about the meaning of the final effective date language, but those statements cannot plausibly be read as reflecting any general agreement.[15] The history reveals no evidence that Mem-

---

[13] See, e. g., H. R. 1, 102d Cong., 1st Sess. §113 (1991), reprinted in 137 Cong. Rec. H3924–H3925 (Jan. 3, 1991). The prospectivity proviso to the section extending Title VII to overseas employers was first added to legislation that generally was to apply to pending cases. See H. R. 1, 102d Cong., 1st Sess. §119(c) (1991), reprinted in 137 Cong. Rec. H3925–H3926 (June 5, 1991). Thus, at the time its language was introduced, the provision that became §109(c) was surely not redundant.

[14] On the other hand, two proposals that would have provided explicitly for prospectivity also foundered. See 137 Cong. Rec. S3021, S3023 (Mar. 12, 1991); id., at 13255, 13265–13266.

[15] For example, in an "interpretive memorandum" introduced on behalf of seven Republican sponsors of S. 1745, the bill that became the 1991 Act, Senator Danforth stated that "[t]he bill provides that, unless otherwise specified, the provisions of this legislation shall take effect upon enactment *and shall not apply retroactively." Id.*, at 29047 (emphasis added). Senator Kennedy responded that it "will be up to the courts to determine the extent to which the bill will apply to cases and claims that were pending on the date of enactment." *Ibid.* (citing *Bradley* v. *School Bd. of Richmond*, 416 U. S. 696 (1974)). The legislative history reveals other partisan statements on the proper meaning of the Act's "effective date" provisions. Senator Danforth observed that such statements carry little weight as legislative history. As he put it:

bers believed that an agreement had been tacitly struck on the controversial retroactivity issue, and little to suggest that *Congress* understood or intended the interplay of §§ 402(a), 402(b), and 109(c) to have the decisive effect petitioner assigns them. Instead, the history of the 1991 Act conveys the impression that legislators agreed to disagree about whether and to what extent the Act would apply to preenactment conduct.

Although the passage of the 1990 bill may indicate that a majority of the 1991 Congress also favored retroactive application, even the will of the majority does not become law unless it follows the path charted in Article I, § 7, cl. 2, of the Constitution. See *INS* v. *Chadha*, 462 U. S. 919, 946–951 (1983). In the absence of the kind of unambiguous directive found in § 15 of the 1990 bill, we must look elsewhere for guidance on whether § 102 applies to this case.

## IV

It is not uncommon to find "apparent tension" between different canons of statutory construction. As Professor Llewellyn famously illustrated, many of the traditional canons have equal opposites.[16] In order to resolve the question left open by the 1991 Act, federal courts have labored to

"[A] court would be well advised to take with a large grain of salt floor debate and statements placed in the CONGRESSIONAL RECORD which purport to create an interpretation for the legislation that is before us." 137 Cong. Rec. S15325 (Oct. 29, 1991).

[16] See Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes are to be Construed, 3 Vand. L. Rev. 395 (1950). Llewellyn's article identified the apparent conflict between the canon that

"[a] statute imposing a new penalty or forfeiture, or a new liability or disability, or creating a new right of action will not be construed as having a retroactive effect"

and the countervailing rule that

"[r]emedial statutes are to be liberally construed and if a retroactive interpretation will promote the ends of justice, they should receive such construction." *Id.*, at 402 (citations omitted).

reconcile two seemingly contradictory statements found in our decisions concerning the effect of intervening changes in the law. Each statement is framed as a generally applicable rule for interpreting statutes that do not specify their temporal reach. The first is the rule that "a court is to apply the law in effect at the time it renders its decision," *Bradley*, 416 U. S., at 711. The second is the axiom that "[r]etroactivity is not favored in the law," and its interpretive corollary that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen*, 488 U. S., at 208.

We have previously noted the "apparent tension" between those expressions. See *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 837 (1990); see also *Bennett*, 470 U. S., at 639–640. We found it unnecessary in *Kaiser* to resolve that seeming conflict "because under either view, where the congressional intent is clear, it governs," and the prejudgment interest statute at issue in that case evinced "clear congressional intent" that it was "not applicable to judgments entered before its effective date." 499 U. S., at 837–838. In the case before us today, however, we have concluded that the 1991 Act does not evince any clear expression of intent on § 102's application to cases arising before the Act's enactment. We must, therefore, focus on the apparent tension between the rules we have espoused for handling similar problems in the absence of an instruction from Congress.

We begin by noting that there is no tension between the *holdings* in *Bradley* and *Bowen*, both of which were unanimous decisions. Relying on another unanimous decision—*Thorpe* v. *Housing Authority of Durham*, 393 U. S. 268 (1969)—we held in *Bradley* that a statute authorizing the award of attorney's fees to successful civil rights plaintiffs applied in a case that was pending on appeal at the time the statute was enacted. *Bowen* held that the Department of Health and Human Services lacked statutory authority to

promulgate a rule requiring private hospitals to refund Medicare payments for services rendered before promulgation of the rule. Our opinion in *Bowen* did not purport to overrule *Bradley* or to limit its reach. In this light, we turn to the "apparent tension" between the two canons mindful of another canon of unquestionable vitality, the "maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens* v. *Virginia*, 6 Wheat. 264, 399 (1821).

## A

As JUSTICE SCALIA has demonstrated, the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.[17] Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.[18] For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser*, 494 U. S., at 855 (SCALIA, J., concurring). In

---

[17] See *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 842–844, 855–856 (1990) (SCALIA, J., concurring). See also, *e. g., Dash* v. *Van Kleeck*, 7 Johns. *477, *503 (N. Y. 1811) ("It is a principle of the *English* common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect") (Kent, C. J.); Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn. L. Rev. 775 (1936).

[18] See *General Motors Corp.* v. *Romein*, 503 U. S. 181, 191 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions"); Munzer, A Theory of Retroactive Legislation, 61 Texas L. Rev. 425, 471 (1982) ("The rule of law . . . is a defeasible entitlement of persons to have their behavior governed by rules publicly fixed in advance"). See also L. Fuller, The Morality of Law 51–62 (1964) (hereinafter Fuller).

a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions.

It is therefore not surprising that the antiretroactivity principle finds expression in several provisions of our Constitution. The *Ex Post Facto* Clause flatly prohibits retroactive application of penal legislation.[19] Article I, § 10, cl. 1, prohibits States from passing another type of retroactive legislation, laws "impairing the Obligation of Contracts." The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a "public use" and upon payment of "just compensation." The prohibitions on "Bills of Attainder" in Art. I, §§ 9–10, prohibit legislatures from singling out disfavored persons and meting out summary punishment for past conduct. See, *e. g., United States* v. *Brown,* 381 U. S. 437, 456–462 (1965). The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause "may not suffice" to warrant its retroactive application. *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 17 (1976).

These provisions demonstrate that retroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals. As Justice Marshall observed in his opinion for the Court in *Weaver* v. *Graham,* 450 U. S. 24 (1981), the *Ex Post Facto* Clause not only en-

---

[19] Article I contains two *Ex Post Facto* Clauses, one directed to Congress (§ 9, cl. 3), the other to the States (§ 10, cl. 1). We have construed the Clauses as applicable only to penal legislation. See *Calder* v. *Bull,* 3 Dall. 386, 390–391 (1798) (opinion of Chase, J.).

sures that individuals have "fair warning" about the effect of criminal statutes, but also "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.*, at 28–29 (citations omitted).[20]

The Constitution's restrictions, of course, are of limited scope. Absent a violation of one of those specific provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope.[21] Retroactivity provisions often serve en-

---

[20] See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 513–514 (1989) ("Legislatures are primarily policymaking bodies that promulgate rules to govern future conduct. The constitutional prohibitions against the enactment of *ex post facto* laws and bills of attainder reflect a valid concern about the use of the political process to punish or characterize past conduct of private citizens. It is the judicial system, rather than the legislative process, that is best equipped to identify past wrongdoers and to fashion remedies that will create the conditions that presumably would have existed had no wrong been committed") (STEVENS, J., concurring in part and concurring in judgment); *James* v. *United States*, 366 U. S. 213, 247, n. 3 (1961) (retroactive punitive measures may reflect "a purpose not to prevent dangerous conduct generally but to impose by legislation a penalty against specific persons or classes of persons").

James Madison argued that retroactive legislation also offered special opportunities for the powerful to obtain special and improper legislative benefits. According to Madison, "[b]ills of attainder, ex post facto laws, and laws impairing the obligation of contracts" were "contrary to the first principles of the social compact, and to every principle of sound legislation," in part because such measures invited the "influential" to "speculat[e] on public measures," to the detriment of the "more industrious and less informed part of the community." The Federalist No. 44, p. 301 (J. Cooke ed. 1961). See Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 693 (1960) (a retroactive statute "may be passed with an exact knowledge of who will benefit from it").

[21] In some cases, however, the interest in avoiding the adjudication of constitutional questions will counsel against a retroactive application. For if a challenged statute is to be given retroactive effect, the regulatory interest that supports prospective application will not necessarily also sustain its application to past events. See *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 730 (1984); *Usery* v. *Turner*

tirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary. However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness.

While statutory retroactivity has long been disfavored, deciding when a statute operates "retroactively" is not always a simple or mechanical task. Sitting on Circuit, Justice Story offered an influential definition in *Society for Propagation of the Gospel* v. *Wheeler*, 22 F. Cas. 756 (No. 13,156) (CC NH 1814), a case construing a provision of the New Hampshire Constitution that broadly prohibits "retrospective" laws both criminal and civil.[22] Justice Story first rejected the notion that the provision bars only explicitly retroactive legislation, *i. e.*, "statutes . . . enacted to take effect from a time anterior to their passage." *Id.*, at 767. Such a construction, he concluded, would be "utterly subversive of all the objects" of the prohibition. *Ibid.* Instead, the ban on retrospective legislation embraced "all statutes, which, though operating only from their passage, affect vested

---

*Elkhorn Mining Co.*, 428 U. S. 1, 17 (1976). In this case the punitive damages provision may raise a question, but for present purposes we assume that Congress has ample power to provide for retroactive application of § 102.

[22] Article 23 of the New Hampshire Bill of Rights provides: "Retrospective laws are highly injurious, oppressive and unjust. No such laws, therefore, should be made, either for the decision of civil causes or the punishment of offenses." At issue in the *Society* case was a new statute that reversed a common-law rule by allowing certain wrongful possessors of land, upon being ejected by the rightful owner, to obtain compensation for improvements made on the land. Justice Story held that the new statute impaired the owner's rights and thus could not, consistently with Article 23, be applied to require compensation for improvements made before the statute's enactment. See 22 F. Cas., at 766–769.

rights and past transactions." *Ibid.* "Upon principle," Justice Story elaborated,

> "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective . . . ." *Ibid.* (citing *Calder* v. *Bull,* 3 Dall. 386 (1798), and *Dash* v. *Van Kleeck,* 7 Johns. *477 (N. Y. 1811)).

Though the formulas have varied, similar functional conceptions of legislative "retroactivity" have found voice in this Court's decisions and elsewhere.[23]

A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, see *Republic Nat. Bank of Miami* v. *United States,* 506 U. S. 80, 100 (1992) (THOMAS, J., concurring in part and concurring in judgment), or upsets expectations based in prior law.[24] Rather, the court must ask

---

[23] See, *e. g., Miller* v. *Florida,* 482 U. S. 423, 430 (1987) ("A law is retrospective if it 'changes the legal consequences of acts completed before its effective date'") (quoting *Weaver* v. *Graham,* 450 U. S. 24, 31 (1981)); *Union Pacific R. Co.* v. *Laramie Stock Yards Co.,* 231 U. S. 190, 199 (1913) (retroactive statute gives "a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed"); *Sturges* v. *Carter,* 114 U. S. 511, 519 (1885) (a retroactive statute is one that "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability"). See also Black's Law Dictionary 1184 (5th ed. 1979) (quoting Justice Story's definition from *Society*); 2 N. Singer, Sutherland on Statutory Construction § 41.01, p. 337 (5th rev. ed. 1993) ("The terms 'retroactive' and 'retrospective' are synonymous in judicial usage . . . . They describe acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act").

[24] Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or

whether the new provision attaches new legal consequences to events completed before its enactment.  The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.  Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity.  However, retroactivity is a matter on which judges tend to have "sound . . . instinct[s]," see *Danforth* v. *Groton Water Co.*, 178 Mass. 472, 476, 59 N. E. 1033, 1034 (1901) (Holmes, J.), and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent.  Thus, in *United States* v. *Heth*, 3 Cranch 399 (1806), we refused to apply a federal statute reducing the commissions of customs collectors to collections commenced before the statute's enactment because the statute lacked "clear, strong, and imperative" language requiring retroactive application, *id.*, at 413 (opinion of Paterson, J.).  The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.  Indeed, at common law a contrary rule applied to statutes that merely *removed* a burden on private rights by repealing a penal provision (whether criminal or civil); such

---

spent his life learning to count cards.  See Fuller 60 ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever").  Moreover, a statute "is not made retroactive merely because it draws upon antecedent facts for its operation."  *Cox* v. *Hart*, 260 U. S. 427, 435 (1922).  See *Reynolds* v. *United States*, 292 U. S. 443, 444–449 (1934); *Chicago & Alton R. Co.* v. *Tranbarger*, 238 U. S. 67, 73 (1915).

repeals were understood to preclude punishment for acts antedating the repeal. See, *e. g., United States* v. *Chambers,* 291 U. S. 217, 223–224 (1934); *Gulf, C. & S. F. R. Co.* v. *Dennis,* 224 U. S. 503, 506 (1912); *United States* v. *Tynen,* 11 Wall. 88, 93–95 (1871); *Norris* v. *Crocker,* 13 How. 429, 440–441 (1852); *Maryland ex rel. Washington Cty.* v. *Baltimore & Ohio R. Co.,* 3 How. 534, 552 (1845); *Yeaton* v. *United States,* 5 Cranch 281, 284 (1809). But see 1 U. S. C. § 109 (repealing common-law rule).

The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance.[25] The presumption has not, however, been limited to such cases. At issue in *Chew Heong* v. *United States,* 112 U. S. 536 (1884), for example, was a provision of the "Chinese Restriction Act" of 1882 barring Chinese laborers from reentering the United States without a certificate prepared when they exited this country. We held that the statute did not bar the reentry of a laborer who had left the United States before the certification requirement was promulgated. Justice Harlan's opinion for the Court observed that the law in effect before the 1882 enactment had accorded laborers a right to reenter without a certificate, and invoked the "uniformly" accepted rule against "giv[ing] to statutes a retro-

---

[25] See, *e. g., United States* v. *Security Industrial Bank,* 459 U. S. 70, 79–82 (1982); *Claridge Apartments Co.* v. *Commissioner,* 323 U. S. 141, 164 (1944); *United States* v. *St. Louis, S. F. & T. R. Co.,* 270 U. S. 1, 3 (1926); *Holt* v. *Henley,* 232 U. S. 637, 639 (1914); *Union Pacific R. Co.* v. *Laramie Stock Yards Co.,* 231 U. S., at 199; *Twenty per Cent. Cases,* 20 Wall. 179, 187 (1874); *Sohn* v. *Waterson,* 17 Wall. 596, 599 (1873); *Carroll* v. *Lessee of Carroll,* 16 How. 275 (1854). While the great majority of our decisions relying upon the antiretroactivity presumption have involved intervening statutes burdening private parties, we have applied the presumption in cases involving new monetary obligations that fell only on the government. See *United States* v. *Magnolia Petroleum Co.,* 276 U. S. 160 (1928); *White* v. *United States,* 191 U. S. 545 (1903).

spective operation, whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature." *Id.*, at 559.

Our statement in *Bowen* that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result," 488 U. S., at 208, was in step with this long line of cases.[26] *Bowen* itself was a paradigmatic case of retroactivity in which a federal agency sought to recoup, under cost limit regulations issued in 1984, funds that had been paid to hospitals for services rendered earlier, see *id.*, at 207; our search for clear congressional intent authorizing retroactivity was consistent with the approach taken in decisions spanning two centuries.

The presumption against statutory retroactivity had special force in the era in which courts tended to view legislative interference with property and contract rights circumspectly. In this century, legislation has come to supply the dominant means of legal ordering, and circumspection has given way to greater deference to legislative judgments. See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S., at 15–16; *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 436–444 (1934). But while the *constitutional* impediments to retroactive civil legislation are now modest, prospectivity remains the appropriate default rule. Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price

---

[26] See also, *e. g.*, *Greene* v. *United States*, 376 U. S. 149, 160 (1964); *White* v. *United States*, 191 U. S. 545 (1903); *United States* v. *Moore*, 95 U. S. 760, 762 (1878); *Murray* v. *Gibson*, 15 How. 421, 423 (1854); *Ladiga* v. *Roland*, 2 How. 581, 589 (1844).

to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

## B

Although we have long embraced a presumption against statutory retroactivity, for just as long we have recognized that, in many situations, a court should "apply the law in effect at the time it renders its decision," *Bradley*, 416 U. S., at 711, even though that law was enacted after the events that gave rise to the suit. There is, of course, no conflict between that principle and a *presumption* against retroactivity when the statute in question is unambiguous. Chief Justice Marshall's opinion in *United States* v. *Schooner Peggy*, 1 Cranch 103 (1801), illustrates this point. Because a treaty signed on September 30, 1800, while the case was pending on appeal, unambiguously provided for the restoration of captured property "not yet *definitively* condemned," *id.*, at 107 (emphasis in original), we reversed a decree entered on September 23, 1800, condemning a French vessel that had been seized in American waters. Our application of "the law in effect" at the time of our decision in *Schooner Peggy* was simply a response to the language of the statute. *Id.*, at 109.

Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive. Thus, in *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184 (1921), we held that § 20 of the Clayton Act, enacted while the case was pending on appeal, governed the propriety of injunctive relief against labor picketing. In remanding the suit for application of the intervening statute,

we observed that "relief by injunction operates *in futuro*," and that the plaintiff had no "vested right" in the decree entered by the trial court. 257 U. S., at 201. See also, *e. g.*, *Hall* v. *Beals*, 396 U. S. 45, 48 (1969); *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 464 (1921).

We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. Thus, in *Bruner* v. *United States*, 343 U. S. 112, 116–117 (1952), relying on our "consisten[t]" practice, we ordered an action dismissed because the jurisdictional statute under which it had been (properly) filed was subsequently repealed.[27] See also *Hallowell* v. *Commons*, 239 U. S. 506, 508–509 (1916); *Assessors* v. *Osbornes*, 9 Wall. 567, 575 (1870). Conversely, in *Andrus* v. *Charlestone Stone Products Co.*, 436 U. S. 604, 607–608, n. 6 (1978), we held that, because a statute passed while the case was pending on appeal had eliminated the amount-in-controversy requirement for federal-question cases, the fact that respondent had failed to allege $10,000 in controversy at the commencement of the action was "now of no moment." See also *United States* v. *Alabama*, 362 U. S. 602, 604 (1960) *(per curiam); Stephens* v. *Cherokee Nation*, 174 U. S. 445, 478 (1899). Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." *Hallowell*, 239 U. S., at 508. Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties," *Republic Nat. Bank of Miami*, 506 U. S., at 100 (THOMAS, J., concurring).

---

[27] In *Bruner*, we specifically noted:

"This jurisdictional rule does not affect the general principle that a statute is not to be given retroactive effect unless such construction is required by explicit language or by necessary implication. Compare *United States* v. *St. Louis, S. F. & T. R. Co.*, 270 U. S. 1, 3 (1926), with *Smallwood* v. *Gallardo*, 275 U. S. 56, 61 (1927)." 343 U. S., at 117, n. 8.

Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity. For example, in *Ex parte Collett,* 337 U. S. 55, 71 (1949), we held that 28 U. S. C. § 1404(a) governed the transfer of an action instituted prior to that statute's enactment. We noted the diminished reliance interests in matters of procedure. 337 U. S., at 71.[28] Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive. Cf. *McBurney* v. *Carson,* 99 U. S. 567, 569 (1879).[29]

---

[28] While we have strictly construed the *Ex Post Facto* Clause to prohibit application of new statutes creating or increasing punishments after the fact, we have upheld intervening procedural changes even if application of the new rule operated to a defendant's disadvantage in the particular case. See, *e. g., Dobbert* v. *Florida,* 432 U. S. 282, 293–294 (1977); see also *Collins* v. *Youngblood,* 497 U. S. 37 (1990); *Beazell* v. *Ohio,* 269 U. S. 167 (1925).

[29] Of course, the mere fact that a new rule is procedural does not mean that it applies to every pending case. A new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime, and the promulgation of a new rule of evidence would not require an appellate remand for a new trial. Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case. See, *e. g.,* Order Amending Federal Rules of Criminal Procedure, 495 U. S. 969 (1990) (amendments applicable to pending cases "insofar as just and practicable"); Order Amending Federal Rules of Civil Procedure, 456 U. S. 1015 (1982) (same); Order Amending Bankruptcy Rules and Forms, 421 U. S. 1021 (1975) (amendments applicable to pending cases "except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice"). Contrary to JUSTICE SCALIA's suggestion, *post,* at 290, we do not restrict the presumption against statutory retroactivity to cases involving "vested rights." (Neither is Justice Story's definition of retroactivity, quoted *supra,* at 269, so restricted.) Nor do we suggest that concerns about retroactivity have no application to procedural rules.

Petitioner relies principally upon *Bradley* v. *School Bd. of Richmond*, 416 U. S. 696 (1974), and *Thorpe* v. *Housing Authority of Durham*, 393 U. S. 268 (1969), in support of her argument that our ordinary interpretive rules support application of § 102 to her case. In *Thorpe*, we held that an agency circular requiring a local housing authority to give notice of reasons and opportunity to respond before evicting a tenant was applicable to an eviction proceeding commenced before the regulation issued. *Thorpe* shares much with both the "procedural" and "prospective-relief" cases. See *supra*, at 273–275. Thus, we noted in *Thorpe* that new hearing procedures did not affect either party's obligations under the lease agreement between the housing authority and the petitioner, 393 U. S., at 279, and, because the tenant had "not yet vacated," we saw no significance in the fact that the housing authority had "decided to evict her before the circular was issued," *id.*, at 283. The Court in *Thorpe* viewed the new eviction procedures as "essential to remove a serious impediment to the successful protection of constitutional rights." *Ibid.*[30] Cf. *Youakim* v. *Miller*, 425 U. S. 231, 237 (1976) *(per curiam)* (citing *Thorpe* for propriety of applying new law to avoiding necessity of deciding constitutionality of old one).

Our holding in *Bradley* is similarly compatible with the line of decisions disfavoring "retroactive" application of statutes. In *Bradley*, the District Court had awarded attorney's fees and costs, upon general equitable principles, to parents who had prevailed in an action seeking to desegregate the public schools of Richmond, Virginia. While the

---

[30] *Thorpe* is consistent with the principle, analogous to that at work in the common-law presumption about repeals of criminal statutes, that the government should accord grace to private parties disadvantaged by an old rule when it adopts a new and more generous one. Cf. *DeGurules* v. *INS*, 833 F. 2d 861, 862–863 (CA9 1987). Indeed, *Thorpe* twice cited *United States* v. *Chambers*, 291 U. S. 217 (1934), which ordered dismissal of prosecutions pending when the National Prohibition Act was repealed. See *Thorpe*, 393 U. S., at 281, n. 38; *id.*, at 282, n. 40.

case was pending before the Court of Appeals, Congress enacted § 718 of the Education Amendments of 1972, which authorized federal courts to award the prevailing parties in school desegregation cases a reasonable attorney's fee. The Court of Appeals held that the new fee provision did not authorize the award of fees for services rendered before the effective date of the amendments. This Court reversed. We concluded that the private parties could rely on § 718 to support their claim for attorney's fees, resting our decision "on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U. S., at 711.

Although that language suggests a categorical presumption in favor of application of *all* new rules of law, we now make it clear that *Bradley* did not alter the well-settled presumption against application of the class of new statutes that would have genuinely "retroactive" effect. Like the new hearing requirement in *Thorpe*, the attorney's fee provision at issue in *Bradley* did not resemble the cases in which we have invoked the presumption against statutory retroactivity. Attorney's fee determinations, we have observed, are "collateral to the main cause of action" and "uniquely separable from the cause of action to be proved at trial." *White* v. *New Hampshire Dept. of Employment Security,* 455 U. S. 445, 451–452 (1982). See also *Hutto* v. *Finney,* 437 U. S. 678, 695, n. 24 (1978). Moreover, even before the enactment of § 718, federal courts had authority (which the District Court in *Bradley* had exercised) to award fees based upon equitable principles. As our opinion in *Bradley* made clear, it would be difficult to imagine a stronger equitable case for an attorney's fee award than a lawsuit in which the plaintiff parents would otherwise have to bear the costs of desegregating their children's public schools. See 416 U. S., at 718 (noting that the plaintiffs had brought the school board "into compliance with its constitutional mandate") (citing *Brown* v. *Board*

*of Education,* 347 U. S. 483, 494 (1954)). In light of the prior availability of a fee award, and the likelihood that fees would be assessed under pre-existing theories, we concluded that the new fee statute simply "d[id] not impose an additional or unforeseeable obligation" upon the school board. *Bradley,* 416 U. S., at 721.

In approving application of the new fee provision, *Bradley* did not take issue with the long line of decisions applying the presumption against retroactivity. Our opinion distinguished, but did not criticize, prior cases that had applied the antiretroactivity canon. See *id.,* at 720 (citing *Greene* v. *United States,* 376 U. S. 149, 160 (1964); *Claridge Apartments Co.* v. *Commissioner,* 323 U. S. 141, 164 (1944), and *Union Pacific R. Co.* v. *Laramie Stock Yards Co.,* 231 U. S. 190, 199 (1913)). The authorities we relied upon in *Bradley* lend further support to the conclusion that we did not intend to displace the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment. See *Kaiser,* 494 U. S., at 849–850 (SCALIA, J., concurring). *Bradley* relied on *Thorpe* and on other precedents that are consistent with a presumption against statutory retroactivity, including decisions involving explicitly retroactive statutes, see 416 U. S., at 713, n. 17 (citing, *inter alia, Freeborn* v. *Smith,* 2 Wall. 160 (1865)),[31] the retroactive application of intervening *judicial* decisions, see 416 U. S., at 713–714, n. 17 (citing, *inter alia, Patterson* v. *Alabama,* 294 U. S. 600, 607 (1935)),[32] statutes

---

[31] In *Bradley,* we cited *Schooner Peggy* for the "current law" principle, but we recognized that the law at issue in *Schooner Peggy* had expressly called for retroactive application. See 416 U. S., at 712, n. 16 (describing *Schooner Peggy* as holding that Court was obligated to "apply the terms of the convention," which had recited that it applied to all vessels not yet *"definitively* condemned") (emphasis in convention).

[32] At the time *Bradley* was decided, it was by no means a truism to point out that rules announced in intervening judicial decisions should normally be applied to a case pending when the intervening decision came down. In 1974, our doctrine on judicial retroactivity involved a substantial measure of discretion, guided by equitable standards resembling the *Bradley*

altering jurisdiction, 416 U. S., at 713, n. 17 (citing, *inter alia*, *United States* v. *Alabama*, 362 U. S. 602 (1960)), and repeal of a criminal statute, 416 U. S., at 713, n. 17 (citing *United States* v. *Chambers*, 291 U. S. 217 (1934)). Moreover, in none of our decisions that have relied upon *Bradley* or *Thorpe* have we cast doubt on the traditional presumption against truly "retrospective" application of a statute.[33]

"manifest injustice" test itself. See *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106–107 (1971); *Linkletter* v. *Walker*, 381 U. S. 618, 636 (1965). While it was accurate in 1974 to say that a new rule announced in a judicial decision was only *presumptively* applicable to pending cases, we have since established a firm rule of retroactivity. See *Harper* v. *Virginia Dept. of Taxation*, 509 U. S. 86 (1993); *Griffith* v. *Kentucky*, 479 U. S. 314 (1987).

[33] See, *e. g.*, *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 661–662, and n. 1 (1989) (considering intervening regulations in injunctive action challenging agency's drug testing policy under Fourth Amendment) (citing *Thorpe*); *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656, 662 (1987) (applying rule announced in judicial decision to case arising before the decision and citing *Bradley* for the "usual rule . . . that federal cases should be decided in accordance with the law existing at the time of the decision"); *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604, 608 (1987) (in case involving retroactivity of judicial decision, citing *Thorpe* for same "usual rule"); *Hutto* v. *Finney*, 437 U. S., at 694, n. 23 (relying on "general practice" and *Bradley* to uphold award of attorney's fees under statute passed after the services had been rendered but while case was still pending); *Youakim*, 425 U. S., at 237 *(per curiam)* (remanding for reconsideration of constitutional claim for injunctive relief in light of intervening state regulations) (citing *Thorpe*); *Cort* v. *Ash*, 422 U. S. 66, 77 (1975) (stating that *Bradley* warranted application of intervening statute transferring to administrative agency jurisdiction over claim for injunctive relief); *Hamling* v. *United States*, 418 U. S. 87, 101–102 (1974) (reviewing obscenity conviction in light of subsequent First Amendment decision of this Court) (citing *Bradley*); *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 49, n. 21 (1974) (in action for injunction against enforcement of banking disclosure statute, citing *Thorpe* for proposition that Court should consider constitutional question in light of regulations issued after commencement of suit); *Diffenderfer* v. *Central Baptist Church of Miami, Inc.*, 404 U. S. 412, 414 (1972) (citing *Thorpe* in holding that intervening repeal of a state tax exemption for certain church property rendered "inappropriate" petitioner's request for injunctive relief based on the Establishment Clause); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 419 (1971) (refusing

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

## V

We now ask whether, given the absence of guiding instructions from Congress, § 102 of the Civil Rights Act of 1991 is the type of provision that should govern cases arising before its enactment. As we observed *supra*, at 260–261, and n. 12, there is no special reason to think that all the diverse provisions of the Act must be treated uniformly for such purposes. To the contrary, we understand the instruction that the provisions are to "take effect upon enactment" to mean that courts should evaluate each provision of the Act in light of ordinary judicial principles concerning the application of new rules to pending cases and preenactment conduct.

Two provisions of § 102 may be readily classified according to these principles. The jury trial right set out in § 102(c)(1) is plainly a procedural change of the sort that would ordinarily govern in trials conducted after its effective date. If § 102 did no more than introduce a right to jury trial in Title

to remand to agency under *Thorpe* for administrative findings required by new regulation because administrative record was already adequate for judicial review); *Hall* v. *Beals,* 396 U. S. 45, 48 (1969) (in action for injunctive relief from state election statute, citing *Thorpe* as authority for considering intervening amendment of statute).

VII cases, the provision would presumably apply to cases tried after November 21, 1991, regardless of when the underlying conduct occurred.[34]   However, because § 102(c) makes a jury trial available only "[i]f a complaining party seeks compensatory or punitive damages," the jury trial option must stand or fall with the attached damages provisions.

Section 102(b)(1) is clearly on the other side of the line. That subsection authorizes punitive damages if the plaintiff shows that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."   The very labels given "punitive" or "exemplary" damages, as well as the rationales that support them, demonstrate that they share key characteristics of criminal sanctions.   Retroactive imposition of punitive damages would raise a serious constitutional question.   See *Turner Elkhorn*, 428 U. S., at 17 (Court would "hesitate to approve the retrospective imposition of liability on any theory of deterrence . . . or blameworthiness"); *De Veau* v. *Braisted*, 363 U. S. 144, 160 (1960) ("The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts").   See also *Louis Vuitton S. A.* v. *Spencer Handbags Corp.*, 765 F. 2d 966, 972 (CA2 1985) (retroactive application of punitive treble damages provisions of Trademark Counterfeiting Act of 1984 "would present a potential *ex post facto* problem").   Before we entertained that question, we would have to be confronted with a statute that explicitly authorized punitive damages for preenactment conduct.   The Civil Rights Act of 1991 contains no such explicit command.

The provision of § 102(a)(1) authorizing the recovery of compensatory damages is not easily classified.   It does not

---

[34] As the Court of Appeals recognized, however, the promulgation of a new jury trial rule would ordinarily not warrant retrial of cases that had previously been tried to a judge.   See n. 29, *supra*.   Thus, customary practice would not support remand for a jury trial in this case.

make unlawful conduct that was lawful when it occurred; as we have noted, *supra*, at 252–255, § 102 only reaches discriminatory conduct already prohibited by Title VII. Concerns about a lack of fair notice are further muted by the fact that such discrimination was in many cases (although not this one) already subject to monetary liability in the form of backpay. Nor could anyone seriously contend that the compensatory damages provisions smack of a "retributive" or other suspect legislative purpose. Section 102 reflects Congress' desire to afford victims of discrimination more complete redress for violations of rules established more than a generation ago in the Civil Rights Act of 1964. At least with respect to its compensatory damages provisions, then, § 102 is not in a category in which objections to retroactive application on grounds of fairness have their greatest force.

Nonetheless, the new compensatory damages provision would operate "retrospectively" if it were applied to conduct occurring before November 21, 1991. Unlike certain other forms of relief, compensatory damages are quintessentially backward looking. Compensatory damages may be *intended* less to sanction wrongdoers than to make victims whole, but they do so by a mechanism that affects the liabilities of defendants. They do not "compensate" by distributing funds from the public coffers, but by requiring particular employers to pay for harms they caused. The introduction of a right to compensatory damages is also the type of legal change that would have an impact on private parties' planning.[35] In this case, the event to which the new damages

---

[35] As petitioner and *amici* suggest, concerns of unfair surprise and upsetting expectations are attenuated in the case of intentional employment discrimination, which has been unlawful for more than a generation. However, fairness concerns would not be entirely absent if the damages provisions of § 102 were to apply to events preceding its enactment, as the facts of this case illustrate. Respondent USI's management, when apprised of the wrongful conduct of petitioner's co-worker, took timely action to remedy the problem. The law then in effect imposed no liability on an employer who corrected discriminatory work conditions before the conditions

provision relates is the discriminatory conduct of respondents' agent John Williams; if applied here, that provision would attach an important new legal burden to that conduct. The new damages remedy in § 102, we conclude, is the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent.

In cases like this one, in which prior law afforded no relief, § 102 can be seen as creating a new cause of action, and its impact on parties' rights is especially pronounced. Section 102 confers a new right to monetary relief on persons like petitioner who were victims of a hostile work environment but were not constructively discharged, and the novel prospect of damages liability for their employers. Because Title VII previously authorized recovery of backpay in some cases, and because compensatory damages under § 102(a) are in addition to any backpay recoverable, the new provision also resembles a statute increasing the amount of damages available under a preestablished cause of action. Even under that view, however, the provision would, if applied in cases arising before the Act's effective date, undoubtedly impose on employers found liable a "new disability" in respect to past events. See *Society for Propagation of the Gospel,* 22 F. Cas., at 767. The *extent* of a party's liability, in the civil context as well as the criminal, is an important legal

---

became so severe as to result in the victim's constructive discharge. Assessing damages against respondents on a theory of *respondeat superior* would thus entail an element of surprise. Even when the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past. Cf. *Weaver,* 450 U. S., at 28–30 (*Ex Post Facto* Clause assures fair notice and governmental restraint, and does not turn on "an individual's right to less punishment"). The new damages provisions of § 102 can be expected to give managers an added incentive to take preventive measures to ward off discriminatory conduct by subordinates *before* it occurs, but that purpose is not served by applying the regime to preenactment conduct.

consequence that cannot be ignored.[36]   Neither in *Bradley* itself, nor in any case before or since in which Congress had not clearly spoken, have we read a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment.   See *Winfree* v. *Northern Pacific R. Co.*, 227 U. S. 296, 301 (1913) (statute creating new federal cause of action for wrongful death inapplicable to case arising before enactment in absence of "explicit words" or "clear implication"); *United States Fidelity & Guaranty Co.* v. *United States ex rel. Struthers Wells*

---

[36] The state courts have consistently held that statutes changing or abolishing limits on the amount of damages available in wrongful-death actions should not, in the absence of clear legislative intent, apply to actions arising before their enactment.   See, *e. g.*, *Dempsey* v. *State*, 451 A. 2d 273 (R. I. 1982) ("Every court which has considered the issue . . . has found that a subsequent change as to the amount or the elements of damage in the wrongful-death statute to be substantive rather than procedural or remedial, and thus any such change must be applied prospectively"); *Kleibrink* v. *Missouri-Kansas-Texas R. Co.*, 224 Kan. 437, 444, 581 P. 2d 372, 378 (1978) (holding, in accord with the "great weight of authority," that "an increase, decrease or repeal of the statutory maximum recoverable in wrongful death actions is *not* retroactive" and thus should not apply in a case arising before the statute's enactment) (emphasis in original); *Bradley* v. *Knutson*, 62 Wis. 2d 432, 436, 215 N. W. 2d 369, 371 (1974) (refusing to apply increase in cap on damages for wrongful death to misconduct occurring before effective date; "statutory increases in damage[s] limitations are actually changes in substantive rights and not mere remedial changes"); *State ex rel. St. Louis-San Francisco R. Co.* v. *Buder*, 515 S. W. 2d 409, 411 (Mo. 1974) (statute removing wrongful-death liability limitation construed not to apply to preenactment conduct; "an act or transaction, to which certain legal effects were ascribed at the time they transpired, should not, without cogent reasons, thereafter be subject to a different set of effects which alter the rights and liabilities of the parties thereto"); *Mihoy* v. *Proulx*, 113 N. H. 698, 701, 313 A. 2d 723, 725 (1973) ("To apply the increased limit after the date of the accident would clearly enlarge the defendant's liability retrospectively.   In the absence of an express provision, we cannot conclude that the legislature intended retrospective application").   See also *Fann* v. *McGuffy*, 534 S. W. 2d 770, 774, n. 19 (Ky. 1975); *Muckler* v. *Buchl*, 150 N. W. 2d 689, 697 (Minn. 1967).

*Co.*, 209 U. S. 306, 314–315 (1908) (construing statute *re-stricting* subcontractors' rights to recover damages from prime contractors as prospective in absence of "clear, strong and imperative" language from Congress favoring retroactivity).[37]

It will frequently be true, as petitioner and *amici* forcefully argue here, that retroactive application of a new statute would vindicate its purpose more fully.[38] That consider-

---

[37] We have sometimes said that new "remedial" statutes, like new "procedural" ones, should presumptively apply to pending cases. See, *e. g.*, *Ex parte Collett*, 337 U. S., at 71, and n. 38 ("Clearly, § 1404(a) is a remedial provision applicable to pending actions"); *Beazell*, 269 U. S., at 171 (*Ex Post Facto Clause* does not limit "legislative control of remedies and modes of procedure which do not affect matters of substance"). While that statement holds true for some kinds of remedies, see *supra*, at 273–274 (discussing prospective relief), we have not classified a statute introducing damages liability as the sort of "remedial" change that should presumptively apply in pending cases. "Retroactive modification" of damages remedies may "normally harbo[r] much less potential for mischief than retroactive changes in the principles of liability," *Hastings* v. *Earth Satellite Corp.*, 628 F. 2d 85, 93 (CADC), cert. denied, 449 U. S. 905 (1980), but that potential is nevertheless still significant.

[38] Petitioner argues that our decision in *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), supports application of § 102 to her case. Relying on the principle that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong,'" *id.*, at 66 (quoting *Bell* v. *Hood*, 327 U. S. 678, 684 (1946)), we held in *Franklin* that the right of action under Title IX of the Education Amendments of 1972 included a claim for damages. Petitioner argues that *Franklin* supports her position because, if she cannot obtain damages pursuant to § 102, she will be left remediless despite an adjudged violation of her right under Title VII to be free of workplace discrimination. However, Title VII of the Civil Rights Act of 1964 is not a statute to which we would apply the "traditional presumption in favor of all available remedies." 503 U. S., at 72. That statute did not create a "general right to sue" for employment discrimination, but instead specified a set of "circumscribed remedies." See *United States* v. *Burke*, 504 U. S. 229, 240 (1992). Until the 1991 amendment, the Title VII scheme did not allow for dam-

ation, however, is not sufficient to rebut the presumption against retroactivity. Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal. A legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute. Indeed, there is reason to believe that the omission of the 1990 version's express retroactivity provisions was a factor in the passage of the 1991 bill. Section 102 is plainly not the sort of provision that *must* be understood to operate retroactively because a contrary reading would render it ineffective.

The presumption against statutory retroactivity is founded upon sound considerations of general policy and practice, and accords with long held and widely shared expectations about the usual operation of legislation. We are satisfied that it applies to § 102. Because we have found no clear evidence of congressional intent that § 102 of the Civil Rights Act of 1991 should apply to cases arising before its enactment, we conclude that the judgment of the Court of Appeals must be affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in the judgments.*

I

I of course agree with the Court that there exists a judicial presumption, of great antiquity, that a legislative enactment affecting substantive rights does not apply retroactively absent *clear statement* to the contrary. See generally *Kaiser*

---

ages. We are not free to fashion remedies that Congress has specifically chosen not to extend. See *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 97 (1981).

*[This opinion applies also to *Rivers* v. *Roadway Express, Inc.*, No. 92–938, *post*, p. 298.]

*Aluminum & Chemical Corp.* v. *Bonjorno,* 494 U. S. 827, 840 (1990) (SCALIA, J., concurring). The Court, however, is willing to let that clear statement be supplied, not by the text of the law in question, but by individual legislators who participated in the enactment of the law, and even legislators in an earlier Congress which tried and failed to enact a similar law. For the Court not only combs the floor debate and Committee Reports of the statute at issue, the Civil Rights Act of 1991 (1991 Act), Pub. L. 102–166, 105 Stat. 1071, see *ante,* at 262–263, but also reviews the procedural history of an earlier, unsuccessful, attempt by a *different* Congress to enact similar legislation, the Civil Rights Act of 1990, S. 2104, 101st Cong., 1st Sess. (1990), see *ante,* at 255–257, 263.

This effectively converts the "clear statement" rule into a "discernible legislative intent" rule—and even that understates the difference. The Court's rejection of the floor statements of certain Senators because they are "frankly partisan" and "cannot plausibly be read as reflecting any general agreement," *ante,* at 262, reads like any other exercise in the soft science of legislative historicizing,[1] undisciplined by any distinctive "clear statement" requirement. If it is a "clear statement" we are seeking, surely it is not enough to insist that the statement can "plausibly be read as reflecting general agreement"; the statement must *clearly* reflect general agreement. No legislative history can do that, of course, but only the text of the statute itself. That has been the meaning of the "clear statement" retroactivity rule from the earliest times. See, *e. g., United States* v. *Heth,* 3 Cranch 399, 408 (1806) (Johnson, J.) ("Unless, therefore, the words are too imperious to admit of a different construction, [the Court should] restric[t] the words of the law to a future

---

[1] In one respect, I must acknowledge, the Court's effort may be unique. There is novelty as well as irony in its supporting the judgment that the floor statements on the 1991 Act are unreliable by citing Senator Danforth's floor statement on the 1991 Act to the effect that floor statements on the 1991 Act are unreliable. See *ante,* at 262–263, n. 15.

operation"); *id.*, at 414 (Cushing, J.) ("[I]t [is] unreasonable, in my opinion, to give the law a construction, which would have such a retrospective effect, unless it contained express words to that purpose"); *Murray* v. *Gibson,* 15 How. 421, 423 (1854) (statutes do not operate retroactively unless "required by express command or by necessary and unavoidable implication"); *Shwab* v. *Doyle,* 258 U. S. 529, 537 (1922) ("[A] statute should not be given a retrospective operation unless its words make that imperative"); see also *Bonjorno, supra,* at 842–844 (concurring opinion) (collecting cases applying the clear statement test). I do not deem that clear rule to be changed by the Court's dicta regarding legislative history in the present case.

The 1991 Act does not expressly state that it operates retroactively, but petitioner contends that its specification of prospective-only application for two sections, §§ 109(c) and 402(b), implies that its other provisions are retroactive. More precisely, petitioner argues that since § 402(a) states that "[e]xcept as otherwise specifically provided, [the 1991 Act] shall take effect upon enactment"; and since §§ 109(c) and 402(b) specifically provide that those sections shall operate only prospectively; the term "shall take effect upon enactment" in § 402(a) must mean *retroactive* effect. The short response to this refined and subtle argument is that refinement and subtlety are no substitute for clear statement. "[S]hall take effect upon enactment" is presumed to mean "shall have prospective effect upon enactment," and that presumption is too strong to be overcome by any negative inference derived from §§ 109(c) and 402(b).[2]

---

[2] Petitioner suggests that in *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1 (1989), the Court found the negative implication of language sufficient to satisfy the "clear statement" requirement for congressional subjection of the States to private suit, see *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985). However, in that case it was the express inclusion of States in the definition of potentially liable "person[s]," see 42 U. S. C. § 9601(21), as reinforced by the limitation of States' liability in certain limited circumstances, see § 9601(20)(D), that led the Court to find a plain statement of liability. See 491 U. S., at 11 (noting the "cascade of plain

## II

The Court's opinion begins with an evaluation of petitioner's argument that the text of the statute dictates its retroactive application. The Court's rejection of that argument cannot be as forceful as it ought, so long as it insists upon compromising the clarity of the ancient and constant assumption that legislation is prospective, by attributing a comparable pedigree to the nouveau *Bradley* presumption in favor of applying the law in effect at the time of decision. See *Bradley* v. *School Bd. of Richmond,* 416 U. S. 696, 711–716 (1974). As I have demonstrated elsewhere and need not repeat here, *Bradley* and *Thorpe* v. *Housing Authority of Durham,* 393 U. S. 268 (1969), simply misread our precedents and invented an utterly new and erroneous rule. See generally *Bonjorno, supra,* at 840 (SCALIA, J., concurring).

Besides embellishing the pedigree of the *Bradley-Thorpe* presumption, the Court goes out of its way to reaffirm the holdings of those cases. I see nothing to be gained by overruling them, but neither do I think the indefensible should needlessly be defended. And *Thorpe,* at least, is really indefensible. The regulation at issue there required that "before *instituting an eviction proceeding* local housing authorities . . . should inform the tenant . . . of the reasons for the eviction . . . ." *Thorpe, supra,* at 272, and n. 8 (emphasis added). The Court imposed that requirement on an eviction proceeding *instituted 18 months before the regulation issued.* That application was plainly retroactive and was wrong. The result in *Bradley* presents a closer question; application of an attorney's fees provision to ongoing litigation is arguably not retroactive. If it *were* retroactive, however, it would surely not be saved (as the Court suggests) by the existence of another theory under which attorney's fees might have been discretionarily awarded, see *ante,* at 277–278.

---

language" supporting liability); *id.,* at 30 (SCALIA, J., concurring in part and dissenting in part). There is nothing comparable here.

## III

My last, and most significant, disagreement with the Court's analysis of this case pertains to the meaning of retroactivity. The Court adopts as its own the definition crafted by Justice Story in a case involving a provision of the New Hampshire Constitution that prohibited "retrospective" laws: a law is retroactive only if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Society for Propagation of the Gospel* v. *Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CC NH 1814) (Story, J.).

One might expect from this "vested rights" focus that the Court would hold all changes in rules of procedure (as opposed to matters of substance) to apply retroactively. And one would draw the same conclusion from the Court's formulation of the test as being "whether the new provision attaches new legal consequences to events completed before its enactment"—a test borrowed directly from our *Ex Post Facto* Clause jurisprudence, see, *e. g., Miller* v. *Florida,* 482 U. S. 423, 430 (1987), where we have adopted a substantive-procedural line, see *id.,* at 433 ("[N]o *ex post facto* violation occurs if the change in the law is merely procedural"). In fact, however, the Court shrinks from faithfully applying the test that it has announced. It first seemingly defends the procedural-substantive distinction that a "vested rights" theory entails, *ante,* at 275 ("Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive"). But it soon acknowledges a broad and ill-defined (indeed, utterly undefined) exception: "[T]he mere fact that a new rule is procedural does not mean that it applies to every pending case." *Ante,* at 275, n. 29. Under this exception, "a new rule concerning the filing of complaints would not govern an action in which the complaint

had already been properly filed," *ibid.*, and "the promulgation of a new jury trial rule would ordinarily not warrant retrial of cases that had previously been tried to a judge," *ante*, at 281, n. 34. It is hard to see how either of these refusals to allow retroactive application preserves any "vested right." " 'No one has a vested right in any given mode of procedure.' " *Ex parte Collett*, 337 U. S. 55, 71 (1949), quoting *Crane* v. *Hahlo*, 258 U. S. 142, 147 (1922).

The seemingly random exceptions to the Court's "vested rights" (substance-*vs.*-procedure) criterion must be made, I suggest, because that criterion is fundamentally wrong. It may well be that the upsetting of "vested substantive rights" was the proper touchstone for interpretation of New Hampshire's constitutional prohibition, as it is for interpretation of the United States Constitution's *Ex Post Facto* Clauses, see *ante*, at 275, n. 28. But I doubt that it has anything to do with the more mundane question before us here: absent clear statement to the contrary, what is the presumed temporal application of a statute? For purposes of *that* question, a *procedural* change should no more be presumed to be retroactive than a *substantive* one. The critical issue, I think, is not whether the rule affects "vested rights," or governs substance or procedure, but rather what is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs *after* the effective date of the statute is covered. Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relevant retroactivity event. A new rule of evidence governing expert testimony, for example, is aimed at regulating the conduct of trial, and the event relevant to retroactivity of the rule is introduction of the testimony. Even though it is a procedural rule, it would unquestionably not be applied to *testimony already taken*— reversing a case on appeal, for example, because the new

rule had not been applied at a trial which antedated the statute.

The inadequacy of the Court's "vested rights" approach becomes apparent when a change in one of the incidents of trial alters substantive entitlements. The opinion classifies attorney's fees provisions as procedural and permits "retroactive" application (in the sense of application to cases involving preenactment conduct). See *ante,* at 277–278. It seems to me, however, that holding a person liable for attorney's fees affects a "substantive right" no less than holding him liable for compensatory or punitive damages, which the Court treats as affecting a vested right. If attorney's fees can be awarded in a suit involving conduct that antedated the fee-authorizing statute, it is because the purpose of the fee award is not to affect that conduct, but to encourage suit for the vindication of certain rights—so that the retroactivity event is the filing of suit, whereafter encouragement is no longer needed. Or perhaps because the purpose of the fee award is to *facilitate* suit—so that the retroactivity event is the termination of suit, whereafter facilitation can no longer be achieved.

The "vested rights" test does not square with our consistent practice of giving immediate effect to statutes that alter a court's jurisdiction. See, *e. g., Bruner* v. *United States,* 343 U. S. 112, 116–117, and n. 8 (1952); *Hallowell* v. *Commons,* 239 U. S. 506 (1916); cf. *Ex parte McCardle,* 7 Wall. 506, 514 (1869); *Insurance Co.* v. *Ritchie,* 5 Wall. 541, 544–545 (1867); see also *King* v. *Justices of the Peace of London,* 3 Burr. 1456, 97 Eng. Rep. 924 (K. B. 1764). The Court explains this aspect of our retroactivity jurisprudence by noting that "a new jurisdictional rule" will often not involve retroactivity in Justice Story's sense because it " 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Ante,* at 274, quoting *Hallowell, supra,* at 508. That may be true sometimes, but surely not always. A jurisdictional rule can deny a litigant a forum for his claim

entirely, see Portal-to-Portal Act of 1947, 61 Stat. 84, as amended, 29 U. S. C. §§ 251–262, or may leave him with an alternate forum that will deny relief for some collateral reason (*e. g.*, a statute of limitations bar). Our jurisdiction cases are explained, I think, by the fact that the purpose of provisions conferring or eliminating jurisdiction is to permit or forbid the exercise of judicial power—so that the relevant event for retroactivity purposes is the moment at which that power is sought to be exercised. Thus, applying a jurisdiction-eliminating statute to undo past judicial action would be applying it retroactively; but applying it to prevent any judicial action after the statute takes effect is applying it prospectively.

Finally, statutes eliminating previously available forms of prospective relief provide another challenge to the Court's approach. Courts traditionally withhold requested injunctions that are not authorized by then-current law, even if they were authorized at the time suit commenced and at the time the primary conduct sought to be enjoined was first engaged in. See, *e. g., American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184 (1921); *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 464 (1921). The reason, which has nothing to do with whether it is possible to have a vested right to prospective relief, is that "[o]bviously, this form of relief operates only *in futuro*," *ibid.* Since the purpose of prospective relief is to affect the future rather than remedy the past, the relevant time for judging its retroactivity is the very moment at which it is ordered.[3]

---

[3] A focus on the relevant retroactivity event also explains why the presumption against retroactivity is not violated by interpreting a statute to alter the future legal effect of past transactions—so-called secondary retroactivity, see *Bowen* v. *Georgetown Univ. Hospital,* 488 U. S. 204, 219–220 (1988) (SCALIA, J., concurring) (citing McNulty, Corporations and the Intertemporal Conflict of Laws, 55 Calif. L. Rev. 12, 58–60 (1967)); cf. *Cox* v. *Hart,* 260 U. S. 427, 435 (1922). A new ban on gambling applies to existing casinos and casinos under construction, see *ante,* at 269–270, n. 24, even though it "attaches a new disability" to those past investments. The

I do not maintain that it will always be easy to determine, from the statute's purpose, the relevant event for assessing its retroactivity. As I have suggested, for example, a statutory provision for attorney's fees presents a difficult case. Ordinarily, however, the answer is clear—as it is in both *Landgraf* and *Rivers* v. *Roadway Express, Inc., post,* p. 298. Unlike the Court, I do not think that any of the provisions at issue is "not easily classified," *ante,* at 281. They are all directed at the regulation of primary conduct, and the occurrence of the primary conduct is the relevant event.

JUSTICE BLACKMUN, dissenting.

Perhaps from an eagerness to resolve the "apparent tension," see *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno,* 494 U. S. 827, 837 (1990), between *Bradley* v. *School Bd. of Richmond,* 416 U. S. 696 (1974), and *Bowen* v. *Georgetown Univ. Hospital,* 488 U. S. 204 (1988), the Court rejects the "most logical reading," *Kaiser,* 494 U. S., at 838, of the Civil Rights Act of 1991, 105 Stat. 1071 (Act), and resorts to a presumption against retroactivity. This approach seems to me to pay insufficient fidelity to the settled principle that the "starting point for interpretation of a statute 'is the language of the statute itself,'" *Kaiser,* 494 U. S., at 835, quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980), and extends the presumption against retroactive legislation beyond its historical reach and purpose.

A straightforward textual analysis of the Act indicates that § 102's provision of compensatory damages and its attendant right to a jury trial apply to cases pending on appeal on the date of enactment. This analysis begins with § 402(a) of the Act, 105 Stat. 1099: "Except as otherwise specifically provided, this Act and the amendments made by this Act

---

relevant retroactivity event is the primary activity of gambling, not the primary activity of constructing casinos.

shall take effect upon enactment." Under the "settled rule that a statute must, if possible, be construed in such fashion that every word has operative effect," *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 36 (1992), citing *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955), § 402(a)'s qualifying clause, "[e]xcept as otherwise specifically provided," cannot be dismissed as mere surplusage or an "insurance policy" against future judicial interpretation. Cf. *Gersman* v. *Group Health Assn., Inc.*, 975 F. 2d 886, 890 (CADC 1992). Instead, it most logically refers to the Act's two sections "specifically provid[ing]" that the statute does not apply to cases pending on the date of enactment: (a) § 402(b), 105 Stat. 1099, which provides, in effect, that the Act did not apply to the then-pending case of *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642 (1989), and (b) § 109(c), 105 Stat. 1078, which states that the Act's protections of overseas employment "shall not apply with respect to conduct occurring before the date of the enactment of this Act." Self-evidently, if the entire Act were inapplicable to pending cases, §§ 402(b) and 109(c) would be "entirely redundant." *Kungys* v. *United States*, 485 U. S. 759, 778 (1988) (plurality opinion). Thus, the clear implication is that, while §§ 402(b) and 109(c) do not apply to pending cases, other provisions—including § 102— do.[1] "'Absent a clearly expressed legislative intention to the contrary, [this] language must . . . be regarded as conclusive.'" *Kaiser*, 494 U. S., at 835, quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S., at 108. The legislative history of the Act, featuring a welter of conflicting and "some frankly partisan" floor statements, *ante*, at 262, but no committee report, evinces no such contrary

---

[1] It is, of course, an "unexceptional" proposition that "a particular statute may in some circumstances *implicitly* authorize retroactive [application]." *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 223 (1988) (concurring opinion) (emphasis added).

legislative intent.[2]   Thus, I see no reason to dismiss as "unlikely," *ante*, at 259, the most natural reading of the statute, in order to embrace some other reading that is also "possible," *ante*, at 260.

Even if the language of the statute did not answer the retroactivity question, it would be appropriate under our precedents to apply § 102 to pending cases.[3]   The well-established presumption against retroactive legislation, which serves to protect settled expectations, is grounded in a respect for vested rights.   See, *e. g.*, Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn. L. Rev. 775, 784 (1936) (retroactivity

---

[2] Virtually every Court of Appeals to consider the application of the 1991 Act to pending cases has concluded that the legislative history provides no reliable guidance.  See, *e. g.*, *Gersman* v. *Group Health Assn., Inc.*, 975 F. 2d 886 (CADC 1992); *Mozee* v. *American Commercial Marine Service Co.*, 963 F. 2d 929 (CA7 1992).

The absence in the Act of the strong retroactivity language of the vetoed 1990 legislation, which would have applied the new law to final judgments as well as to pending cases, see H. R. 4000, 101st Cong., 2d Sess., § 15(b)(3) (1990), reprinted at 136 Cong. Rec. H6829 (Aug. 3, 1990) (providing that "any final judgment entered prior to the date of the enactment of this Act as to which the rights of any of the parties thereto have become fixed and vested . . . shall be vacated in whole or in part if justice requires" and the Constitution permits), is not instructive of Congress' intent with respect to pending cases alone.  Significantly, Congress also rejected language that put pending claims beyond the reach of the 1990 or 1991 Act. See *id.*, at H6747 (Michel-LaFalce amendment to 1990 Act) ("The amendments made by this Act shall not apply with respect to claims arising before the date of enactment of this Act"); *id.*, at H6768 (Michel-LaFalce amendment rejected); 137 Cong. Rec. S3023 (daily ed. Mar. 12, 1991) (Sen. Dole's introduction of S. 611, which included the 1990 Act's retroactivity provision); *id.*, at 13255, 13265–13266 (introduction and defeat of Michel substitute for H. R. 1).

[3] Directly at issue in this case are compensatory damages and the right to a jury trial.  While there is little unfairness in requiring an employer to compensate the victims of intentional acts of discrimination, or to have a jury determine those damages, the imposition of punitive damages for preenactment conduct represents a more difficult question, one not squarely addressed in this case and one on which I express no opinion.

doctrine developed as an "inhibition against a construction which . . . would violate vested rights"). This presumption need not be applied to remedial legislation, such as § 102, that does not proscribe any conduct that was previously legal. See *Sampeyreac* v. *United States*, 7 Pet. 222, 238 (1833) ("Almost every law, providing a new remedy, affects and operates upon causes of action existing at the time the law is passed"); *Hastings* v. *Earth Satellite Corp.*, 628 F. 2d 85, 93 (CADC) ("Modification of remedy merely adjusts the extent, or method of enforcement, of liability in instances in which the possibility of liability previously was known"), cert. denied, 449 U. S. 905 (1980); 1 J. Kent, Commentaries on American Law *455–*456 (Chancellor Kent's objection to a law "affecting and changing vested rights" is "not understood to apply to *remedial* statutes, which may be of a retrospective nature, provided they do not impair contracts, or disturb absolute vested rights").

At no time within the last generation has an employer had a vested right to engage in or to permit sexual harassment; "'there is no such thing as a vested right to do wrong.'" *Freeborn* v. *Smith*, 2 Wall. 160, 175 (1865). See also 2 N. Singer, Sutherland on Statutory Construction § 41.04, p. 349 (4th rev. ed. 1986) (procedural and remedial statutes that do not take away vested rights are presumed to apply to pending actions). Section 102 of the Act expands the remedies available for acts of intentional discrimination, but does not alter the scope of the employee's basic right to be free from discrimination or the employer's corresponding legal duty. There is nothing unjust about holding an employer responsible for injuries caused by conduct that has been illegal for almost 30 years.

Accordingly, I respectfully dissent.