**Frank MAYO, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**No. 96–AA–716.**

District of Columbia Court of Appeals.

Argued Sept. 16, 1999.

Decided Oct. 7, 1999.

---

Stephen Chertkof, Washington, DC, for petitioner.

Sheila Kaplan, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for respondent.

Before TERRY, FARRELL, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

This petition for review challenges the denial of compensation to petitioner under a former (now-repealed) version of the Victims of Violent Crime Compensation Act (VVCCA). That statute required a person filing a claim for compensation to do so "within 180 days after the crime [of which the person had been a victim]," but provided that "this time limit may be extended for good cause shown." D.C.Code § 3-402(a)(2) (1994). Regulations implementing the statute defined "good cause" sufficient to waive the limitations bar as including: "The physical or mental incapacity of the claimant." 28 DCMR § 2303.4(a) (1987).

Petitioner filed a crime victims' compensation claim outside the 180-day period, but in proceedings before the District of Columbia Department of Employment Services (DOES), which administered the former act, he presented evidence that he had been mentally incapacitated during the relevant time. A hearing and appeals examiner, followed by the DOES Acting Deputy Director for Labor Standards, rejected the showing of good cause and denied petitioner benefits. While petitioner was seeking review in this court, the Council of the District of Columbia repealed the old VVCCA and replaced it with a new one that contained, among other things, a liberalized statute of limitations. Petitioner's first argument to us is that he should be given the benefit of that statute. For reasons explained in part II, we reject that argument. Petitioner further argues that the Deputy Director's rejection of his good cause showing is flawed, in part because it appeared to rest on the conclusion that although petitioner himself was mentally "incapacitated" during the 180-day period,

*someone else* could have filed for compensation on his behalf just as they had done with regard to a claim for workers' compensation he had made. We agree with petitioner, for reasons stated in part III, that the Deputy Director's analysis of the incapacity issue reveals enough confusion on this point that a remand is necessary for further consideration and clarification. Moreover, the analysis appears to reflect a misunderstanding about the relationship between crime victims' compensation and what the statute expressly terms "collateral sources," including workers' compensation, from which a claimant has also been compensated. Finally, we simply cannot be sure of what finding the agency made on the pivotal issue of whether petitioner suffered from a mental incapacity during the period relevant to timely filing of a claim. For these reasons, we vacate the agency's decision and remand for further consideration.

## I.

The facts of the assault giving rise to petitioner's claim for benefits are not disputed. As the hearing examiner found, petitioner was the innocent victim of a violent crime on January 22, 1993, when he was assaulted at the Brookland station of the United States Postal Service, for which he worked as a driver. The armed assailant, while attempting a robbery, threatened petitioner by telling him fifteen times or more, "Prepare to die!" This incident caused petitioner to have flashbacks to an attempted robbery in 1990 while he was loading money into a mail truck, when he was held hostage at gunpoint and the assailant pointed the gun at his head and pulled the trigger, only to have the gun misfire. The examiner described petitioner's mental condition after the January 1993 assault as follows:

> The record reveals that petitioner experienced a number of physical and emotional difficulties as a result of the 1993 violent crime including flashbacks, sleeping disorders and generally a constant sickly state. [The] credible testimony [of Dr. Arnsdorf, petitioner's treating psychologist,] about her treatment sessions[,] as well as the various medications prescribed by Dr. Griffin, [his treating] psychiatrist, supported the seriousness of petitioner's condition. In addition to not performing his regular duties, petitioner could not work overtime and could not operate his taxicab[, a part-time supplemental job]. He further admitted on the record that when he applied for workers' compensation, his claim was denied for a year, forcing him to rely on his wife's salary and to sell his boat and a car in order to survive financially.

Aided by Dr. Arnsdorf, petitioner had filed for workers' compensation beginning in February 1993. The claim was initially denied and he appealed,[1] ultimately prevailing to the extent that he was awarded 75% of his base salary in benefits.[2] On March 3, 1994, fourteen months after the assault, he applied for crime victims' com-

---

1. Dr. Arnsdorf described her interaction with petitioner during this time:
   > Q. In terms of Mr. Mayo functioning, was Mr. Mayo able to deal with letters and appeals?
   > A. [Dr. Arnsdorf]. Not at that point, no.
   > Q. Can you describe it more?
   > A. Basically, he would bring the stuff in to me, sometimes even unopened. Or he would call me and say: Well, I got this letter.
   > And when he came in to see me, we would work it through. I helped him—and Dr. Griffin also—helped him file the appeal with the Department of Labor.

   > I will say, Mr. Mayo worked very hard to get that appeal, to have it succeed. He contacted his Congress person, tried to work through the hierarchy of the Postal Service. Dr. Waugh [chief medical officer, USPS] was also working on his behalf.... And basically, we rattled every tree and cage that we could find to get him paid. [Footnote omitted.]

2. His base salary was $744.80 a week ($38,700 annually). At the time of the hearing he was also receiving Social Security disability payments of $931 a month.

pensation benefits. Following an evidentiary hearing, the hearing examiner found that, "[a]t first blush, it appears that a strong argument might be made that good cause has been demonstrated to excuse the late filing of the claim"—a reference to what the examiner found to be petitioner's "[serious] physical and emotional difficulties." The examiner also found, however, that since petitioner had not "appl[ied] for crime victims' benefits until after his workers' compensation claim was finally accepted, a strong and ... reasonable inference may be drawn that [he] applied for [them] specifically to augment his workers' compensation award in order to fully replace his salary." Pointing out that "petitioner might have timely filed both a workers' compensation claim and crime victims' claim," the examiner concluded that, "[i]n either case, ... petitioner, or someone on petitioner's behalf, was bound to follow the filing deadlines for each program." Accordingly, "petitioner's attempt to augment his workers' compensation benefits with a crime victims' compensation award fail[ed] to establish good cause for the late filing . . . ."

On administrative appeal, the Deputy Director adopted the examiner's recommended denial of the claim. Observing that the hearing examiner had been "keenly aware of the psychological difficulties [petitioner] was having," the Deputy Director continued:

> The Hearing Examiner was persuaded, however, that claimant's actions, albeit with the assistance of Dr. Arnsdorf, in applying for workers' compensation benefits first, and then not applying for crime victims' benefits until he had been awarded workers' compensation benefits (and found the award of 75% of his $38,000.00 base pay to be insufficient) [d]o not establish good cause for the 14 month delay in filing the claim.

The Deputy Director went on to reason that petitioner had received a "make whole" remedy in the form of "tax free receipt of 75% of his base salary[ ] and payment of his medical expenses" as workers' compensation, and that "[a]ny subsequent award of crime victims' benefits would amount to unjust enrichment since petitioner would be receiving compensation for the same injury." Returning to the issue of petitioner's mental condition during the limitations period, the Deputy Director stated:

> Although *there is no dispute that petitioner was incapacitated* following the violent crime, the record is also undisputed that petitioner, *or someone on petitioner's behalf* (Dr. Arnsdorf), filed for workers' compensation benefits within 45 days of the January 22, 1993 incident. Petitioner, *or someone on petitioner's behalf* such as his wife (or Dr. Arnsdorf), might just as easily [have] filed a claim for crime victims' benefits within that same timeframe. [Emphases added.]

Since, as the Deputy Director concluded, "petitioner, or someone on petitioner's behalf, might have filed a crime victims' compensation claim as readily as filing a workers' compensation claim," she adopted the hearing examiner's finding of no good cause and denied the claim for benefits.

## II.

The crime victims' compensation program in effect at the time of petitioner's claim, and of its denial by the Deputy Director, was overhauled in 1997 as a result of problems it had experienced over the years. *See Parrish v. District of Columbia*, 718 A.2d 133, 134 (D.C.1998). As originally enacted in 1981, the VVCCA was repealed and replaced by the present act codified at D.C.Code §§ 3–421 through – 428 (1999 Supp.). Petitioner points out that the new act liberalized the statute of limitations by requiring that a claim for compensation be filed "within 1 year after the crime occurred *or* 1 year after [the claimant has] learn[ed] of the [CVC] Program[,] with an adequate showing that the delay in learning of the program was reasonable." D.C.Code § 3–426(a)(2) (empha-

sis added). Based upon his testimony that he did not learn of the crime victims' compensation program until after he had been awarded only partial workers' compensation and "was in hardship," petitioner argues that he should receive the benefit of the new limitations rule—without regard to why he missed the old deadline—under the doctrine that "a court is to apply the law in effect at the time it renders its decision." *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

■ We need not consider whether (as the new statute requires) petitioner made an "adequate showing" that his delay in learning of the crime victims' program was "reasonable," because we reject his argument for retroactive application. The new act repealed and replaced the old one root and branch, *see Parrish,* 718 A.2d at 134 (the act "creat[ed] a new system for compensating crime victims"), beginning with the transfer of jurisdiction over claims for victims' compensation from DOES to the Superior Court. *See* D.C.Code § 3–423(a). While in general its reach is prospective (covering claims "filed pursuant to this"— the newly enacted—"chapter," *id.* § 3–423(c)(1)), it also requires the Superior Court to "[p]rocess and maintain claims . . . previously filed pursuant to the Victims of Violent Crime Compensation Act of 1981," which it repeals. *Id.* § 3–423(c)(3). The natural import of these words is that the act reaches back to include those claims—but only those claims—still undergoing or awaiting "process" by DOES. As to these, the benefits of permitting claimants a fresh start under the new regime are deemed to outweigh the advantages of allowing the court to begin its new administrative task on a clean slate. But the same language implies that the act does not reach back to include cases previously resolved by final order of the agency.

■ In arguing for retroactivity, petitioner runs up against "the first rule of [statutory] construction that legislation must be considered as addressed to the future, not to the past" and that "a retrospective operation will not be given to a statute . . . unless such be the 'unequivocal and inflexible import of the terms.'" *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964) (quoted in *Alpizar v. United States,* 595 A.2d 991, 993–94 (D.C.1991)). Here, as indicated, the terms reveal no such unequivocal intent to reach claims already "process[ed]" and decided by DOES; they imply just the contrary. Because we are convinced that the legislature has "prescribed the [new] statute's proper reach," *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), we decline petitioner's invitation to invoke "judicial default rules," *id.,* such as the one enunciated in *Bradley v. School Bd. of Richmond, supra.* Moreover, as the Court stated in *Landgraf, Bradley* is "compatible with the line of decisions disfavoring 'retroactive' application of statutes." *Id.* at 276, 114 S.Ct. 1483. Even if the statute did not expressly address the issue of retroactivity, we would be loath to apply it so as to revive claims already resolved administratively and thereby impose responsibilities on the Superior Court "with respect to transactions already completed." *Id.* at 280, 114 S.Ct. 1483.

### III.

To hold that petitioner may not receive the benefit of the new statute of limitations, however, does not end our analysis. Petitioner argues that even if—as the old statute required—he was required to show good cause for failure to file his claim within 180 days, the Deputy Director's rejection of the claim was flawed in key respects. First, the Deputy Director erroneously concluded that awarding crime victims' compensation benefits to petitioner "would amount to unjust enrichment" since he had previously been "made whole" by receiving workers' compensation for the same (work-related) injury. Second, petitioner asserts that while finding "no dispute that petitioner was incapacitated"

during the relevant time, the Deputy Director erroneously rejected the showing of good cause because "someone on petitioner's behalf" could have filed a timely claim even if petitioner himself was unable to. We treat these contentions in succession.

## A.

■ The hearing examiner recommended denial of the claim, and the Deputy Director adopted the recommendation, on the precise ground that petitioner had filed it too late without showing good cause for having done so. Nevertheless, the Deputy Director also was plainly influenced by her conclusion that awarding crime victims' compensation on top of the workers' compensation petitioner had received would unjustly enrich him. That view reflects a misunderstanding of the statute, which made clear that funds from "collateral sources," D.C.Code § 3–403(b) (1994), defined to include benefits from "Workers' Compensation," *id.* § 3–401(2)(B) (1994), were an offset to the calculation of the claimant's economic losses, but not a *bar* to crime victims' compensation.[3] Petitioner testified that even with workers' compensation paying 75% of his base salary and Social Security, he suffered the additional economic losses of part of his base salary, customary overtime, and income from his part-time job of cab driving. No evidence contradicted this claim. Consequently, it would not be unjust—indeed, it would be fully consistent with the statute—for petitioner to receive additional compensation under the VVCCA. The Deputy Director's apparent belief that workers' compensation provided the "exclusive" remedy for petitioner's work-related injury[4] was mistaken.

## B.

■ More difficult to determine is whether the Deputy Director erred in resolving the issue of "mental incapacity" as good cause for the late filing. Her reasoning is not clear. Much of the language of her decision supports the interpretation petitioner offers, namely, that even though "there is no dispute that petitioner [himself] was incapacitated following the violent crime," he was not excused from the requirement of a timely filing because someone else could have filed a claim "on [his] behalf." Four times the Deputy Director referred disjunctively to petitioner *or* someone else who could have filed a timely claim for him. If this was the Deputy Director's reason for finding no good cause, she erred. Treating the claimant and a surrogate interchangeably would effectively read "mental incapacity" out of the definition of good cause, since one can hardly imagine an incapacitated person undergoing treatment in whose place "someone else" could not have filed a claim, at least in principle. Nor were there any special facts of surrogacy in this case. The fact that, as the Deputy Director explained, Dr. Arnsdorf had assisted petitioner in filing for workers' compensation—in part to receive payment for her medical services—is no reason to assume that she even knew of the existence of a separate program for compensating victims of violent crime. Additionally, we observe that "[t]he failure or noncooperation of persons who would reasonably aid a victim in filing a claim" is itself an excuse

---

3. See COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE REPORT ON BILL NO. 4–361, *The "Victims of Violent Crimes Compensation Act of 1981,"* at 4 (December 16, 1981):

> The fact that benefits were received or available to a victim from other government programs [such as enumerated programs like Workers' Compensation] would not prohibit the victim from being awarded compensation under this bill. However, as with court-ordered restitution, the benefits would be considered a collateral source and would be taken into account in determining the amount of compensation to be awarded under this bill.

4. "The legislature" through workers' compensation, the Deputy Director wrote, "has specifically and *exclusively* defined the concept of 'being made whole' due to a work related injury" (emphasis added).

for untimely filing. 28 DCMR § 2303.4(c). It would be bizarre if the mere existence of such persons were nonetheless reason to reject a claim of incapacity.

In its brief, however, DOES argues that the reason the Deputy Director ultimately denied petitioner benefits was that petitioner had not in fact been unable to file in time—he had not been incapacitated—but instead had miscalculated that workers' compensation would make him whole and so explored other remedies only after he was disappointed. We cannot discount this interpretation of the decision, because the Deputy Director hewed closely to the analysis of the hearing examiner, who found it a "strong and ... reasonable inference ... that petitioner applied for crime victims' benefits specifically to augment his workers' compensation award in order to fully replace his salary." Commenting on this analysis, the Deputy Director stated that "the Hearing Examiner was mindful of the spirit and the intent of the Act and correctly decided that *forum shopping for benefits* does not establish good cause for failing to file a timely claim" (emphasis added). A finding that petitioner was "forum shopping" or that he mistakenly—but comprehendingly—had put all his eggs in the workers' compensation basket would contradict a finding that he was incapable of understanding the legal "fora" open to him.

A great deal depends upon whether DOES found that petitioner was or was not mentally incapacitated. If in fact the agency found that he was (but denied him benefits for the erroneous reasons discussed above), we could not say that that finding lacks substantial support in the record as a whole. *See Cooper v. District of Columbia Dep't of Employment Servs.*, 588 A.2d 1172, 1174 (D.C.1991). Although we are less certain that the record would support a contrary finding that petitioner

is able "to manage his business affairs or estate," *see* D.C.Code § 12–302(a)(2) (1995),[5] we are not prepared at this stage to reject such a finding as a matter of law. Rather, we believe the correct disposition is to vacate the Deputy Director's decision and remand the case for the agency to make explicit findings with respect to the issue of mental incapacity. These should include, though they need not be limited to, an evaluation of Dr. Arnsdorf's testimony but also such matters as what role petitioner played personally in drafting a letter to a Congressman (apparently during the summer of 1993) requesting help in regard to workers' compensation. We leave to the agency's discretion whether additional testimony or evidence needs to be taken to assist in these determinations. Should the agency find that petitioner was not mentally incapacitated during the relevant time and so was not excused from the failure to make a timely claim, petitioner again may seek review of that decision in this court. Should the agency find that he was incapacitated, it should proceed to consider his claim on the merits and make whatever award the statute in its judgment requires. As the Fund is now administered by the Superior Court, we expect that that court will issue an award in conformity with the agency's determination.

*Decision vacated and case remanded for proceedings not inconsistent with this opinion.*

---

**5.** The quoted language is from *McCracken v. Walls–Kaufman*, 717 A.2d 346, 354 (D.C. 1998), interpreting the *non compos mentis* provision that tolls application of the general civil statute of limitations. See D.C.Code §§ 12–301; –302(a)(2). The parties agree that this provision provides the most useful point of reference in interpreting "mental incapacity" under 28 DCMR § 2302.4(a).