# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2011　　　　　Decided March 20, 2012

No. 10-7168

METROIL, INC.,
APPELLANT

v.

EXXONMOBIL OIL CORPORATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01860)

*Peter H. Gunst* argued the cause and filed the briefs for appellant.

*Mark A. Klapow* argued the cause and filed the brief for appellees ExxonMobil Oil Corporation and Exxon Mobil Corporation.

*Alphonse M. Alfano* argued the cause and filed the brief for appellee Anacostia Realty, LLC.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*:  This case involves a dispute over operation of an Exxon gas station located next to the Watergate in Washington, D.C.  Until 2009, Exxon owned the station and leased it to Metroil, a gas station franchisee that operated the station.  In 2009, Exxon sold the station to Anacostia, a gasoline distributor.  After Exxon sold the station to Anacostia, Metroil continued to operate the station.  But Metroil nonetheless sued Exxon and Anacostia, claiming three violations of federal and D.C. law relating to the sale of the station by Exxon to Anacostia.

First, Metroil contends that Exxon's sale to Anacostia violated a D.C. law, the Retail Service Station Amendment Act of 2009.  That Act granted existing gas station franchisees (such as Metroil) a right of first refusal before the sale of a station.  However, the Act did not take effect until after Exxon's sale to Anacostia, and the law therefore did not give Metroil a right of first refusal in this case.

Second, Metroil alleges a violation of the federal Petroleum Marketing Practices Act, which as relevant here requires gas station franchisors to continue franchise relationships except under certain circumstances.  According to Metroil, after the sale from Exxon to Anacostia, Anacostia illegally failed to continue the pre-existing franchise relationship.  However, it is undisputed that Metroil still operates the gas station, buys and sells Exxon fuel, and uses the Exxon trademark.  Under the Act, those three facts mean that the franchise relationship has continued.

Third, Metroil claims that Exxon violated the D.C. Code's prohibition against contract assignments that materially increase the burden or risk on the non-assigning party. Metroil argues that Exxon's assignment of the franchise agreement to Anacostia materially increased the burdens and risks imposed on Metroil. But all of the burdens and risks alleged by Metroil were permitted by the original contract and are not attributable to the assignment.

In a thorough and well-reasoned opinion, the District Court dismissed Metroil's complaint. We affirm.

I

Until 2009, Exxon owned the gas station at 2708 Virginia Avenue, N.W., next to the Watergate in the District of Columbia. In 2006, Exxon signed a three-year franchise agreement with Metroil under which Metroil would operate the gas station. Exxon thus acted as the franchisor, and Metroil acted as the franchisee.

Under the franchise agreement, Metroil was to operate the Exxon gas station, sell Exxon fuel at the station, and use Exxon's trademarks. The 2006 agreement also provided that "ExxonMobil may transfer or assign all or part of its rights or interest . . . without restriction . . . to any person or entity." J.A. 209. In the agreement, Metroil acknowledged that an assignment could affect its rights and obligations to the extent that an assignee had different policies or programs than Exxon, and Metroil agreed that such an impact was contemplated by the parties under the agreement. The agreement further stated that the fuel prices charged by Exxon to Metroil were "subject to change by ExxonMobil at any time and without notice," and that the method of payment (by

Metroil to Exxon for the fuel) could include "any" method "as ExxonMobil may designate from time to time." J.A. 186, 187. The agreement had an expiration date of June 30, 2009, which was later extended to July 31, 2009.

In 2008, Exxon announced that it intended to sell its U.S. gas stations to gasoline distributors. Distributors often purchase and resell multiple brands of gasoline. Sometimes, they also operate gas stations. Many Exxon franchisees were alarmed by Exxon's decision. They feared that the distributors would jack up rents and prices in order to force the gas station franchisees out of business, which would allow the distributors to take over operation of the stations.

On January 22, 2009, in response to Exxon's decision to sell its gas stations to distributors, D.C. City Council Member Mary Cheh introduced a bill to give franchisees "a right of first refusal in the event that a franchisor sells, transfers, or assigns its interest in the premises of a retail service station to a third-party." Committee on Government Operations and the Environment, Council of the District of Columbia, Report on the Retail Service Station Amendment Act of 2009, Bill 18-89, at 8 (Apr. 2, 2009).

On April 2, 2009, the D.C. Council's Committee on Government Operations and the Environment met to consider and vote on the bill. Council Member Cheh explained "the urgent need for the legislation because of [the] proposed sale by Exxon of its interests in the District's retail service stations." *Id.* at 9. Council Member Harry Thomas offered an amendment, clarifying that "the right of first refusal would not apply to contracts executed before April 1, 2009, in order to avoid potential constitutional problems related to impairment of contracts." *Id.* at 10. The Committee then

voted unanimously to approve the bill with the Thomas amendment.

On May 5, 2009, the D.C. Council passed the legislation. On May 20, 2009, Mayor Fenty signed the legislation, as is generally required for a D.C. bill to be enacted. *See* D.C. CODE § 1-204.04(e).[1] In light of D.C.'s unique constitutional status, Congress also has an opportunity to review D.C. legislation before a new D.C. law may take effect. *See* D.C. CODE § 1-206.02(c). Here, as a result of that congressional review, the law did not take effect until July 18, 2009. *See* 56 D.C. Reg. 6137 (Aug. 7, 2009).

Meanwhile, in June 2009 – after the Council passed and the Mayor signed the new law, but before the law took effect – Exxon sold the gas station and assigned the franchise agreement to Anacostia Realty, a gasoline distributor.

Council Member Cheh viewed this and other Exxon sales in D.C. that occurred at the same time as a beat-the-clock step by Exxon. On June 30, 2009, she introduced an "Emergency Declaration Resolution." The Resolution stated in pertinent part:

> (c) Notwithstanding the clear legislative intent that the right of first refusal attach to transfers, sales, or assignments made after April 1, 2009, a franchisor transferred its interest in approximately 29 stations in the

---

[1] A bill can also be enacted if the Mayor fails to act on the bill within 10 days after it is presented or if a mayoral veto is overridden by two-thirds of the Council. *See* D.C. CODE § 1-204.04(e).

District without offering a right of first refusal. That transfer occurred on or about Monday, June 15, 2009.

(d) This emergency will confirm the Council's intent to ensure that a franchisee possesses the right of first refusal before any sale, transfer, or assignment of a franchisor's interest in a leased marketing premises occurring on or after April 1, 2009, as established under the Retail Service Station Amendment Act of 2009.

Retail Service Station Amendment Emergency Declaration Resolution of 2009, D.C. Council PR18-397 (unenacted).

Under D.C. law, nine votes (out of the 13 Council Members) are needed to pass that kind of emergency legislation. *See* D.C. CODE § 1-204.12(a); D.C. Council Rule 412 (2009). The Cheh proposal failed to obtain the necessary nine votes.

Since Exxon's sale to Anacostia in June 2009, Metroil and Anacostia have not signed a new franchise agreement. But Anacostia still allows Metroil to operate the gas station, still supplies Exxon fuel to Metroil, and still allows Metroil to use Exxon trademarks. According to Metroil, however, Anacostia has charged higher prices for the fuel and required a new means of payment.

Metroil later sued Exxon and Anacostia, claiming as relevant here that: (1) Exxon violated the D.C. Retail Service Station Amendment Act when Exxon sold the gas station to Anacostia without offering Metroil a right of first refusal, (2) Anacostia violated the federal Petroleum Marketing Practices Act when Anacostia failed to continue the franchise

relationship with Metroil, and (3) Exxon violated the D.C. Code by assigning the franchise agreement to Anacostia.

Anacostia and Exxon filed separate motions to dismiss. The District Court granted the motions to dismiss, holding that the D.C. Retail Service Station Amendment Act did not apply retroactively to Exxon's sale to Anacostia, that there was not a failure to continue the franchise relationship (much less an unlawful failure to continue) for purposes of the federal Petroleum Marketing Practices Act, and that Exxon's assignment did not violate the D.C. Code.

Metroil now appeals. Our review of these questions of law is de novo.

II

Metroil first argues that Exxon violated the D.C. Retail Service Station Amendment Act of 2009 by selling the gas station to Anacostia without affording Metroil a right of first refusal to buy the station.

The Retail Service Station Amendment Act of 2009 provided that:

> In the case of leased marketing premises as to which the franchisor owns a fee interest, the franchisor shall not sell, transfer, or assign to another person the franchisor's interest in the premises unless the franchisor has first either made a bona fide offer to sell, transfer, or assign to the franchisee the franchisor's interest in the premises, . . . or, if applicable, offered to the franchisee a right of first refusal of any bona fide offer acceptable to the

franchisor made by another person to purchase the franchisor's interest in the premises.

D.C. CODE § 36-304.12(a) (expired Jan. 1, 2011).

The Act took effect on July 18, 2009, and expired on January 1, 2011. The key question here is whether the Act applied to a sale that occurred in June 2009, before the Act's effective date.

Under D.C. law, statutes are presumed not to apply retroactively.[2] That presumption stems from bedrock rule of law values that counsel against retroactive application of new laws. *See generally Landgraf v. USI Film Products*, 511 U.S. 244, 265-67 (1994). Therefore, if a statute would attach new legal consequences to events completed before its effective date – by impairing rights a party possessed when it acted, increasing a party's liability for past conduct, or imposing new duties with respect to transactions already completed – then the statute does not apply retroactively to those events

---

[2] The relevant state's retroactivity principles – here, D.C.'s – govern the analysis of whether a particular state law applies retroactively. *See, e.g.*, *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168 n.12 (9th Cir. 2011) (Arizona law); *Holt v. State Farm Fire & Casualty Co.*, 627 F.3d 188, 191-95 (5th Cir. 2010) (Louisiana law); *In re Professionals Direct Insurance Co.*, 578 F.3d 432, 441 (6th Cir. 2009) (Ohio law); *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1366 (11th Cir. 2006) (per curiam) (Georgia law); *Central Kansas Credit Union v. Mutual Guaranty Corp.*, 102 F.3d 1097, 1110-11 (10th Cir. 1996) (Kansas law); *Centre Beverage Co. v. Miller Brewing Co.*, 779 F.2d 168, 169-70 (3d Cir. 1985) (Pennsylvania law). *See generally* Abbe R. Gluck, *Intersystemic Statutory Interpretation: Methodology as "Law" and the* Erie *Doctrine*, 120 YALE L.J. 1898 (2011).

absent "a clear legislative showing" favoring such a result. *Bank of America, N.A. v. Griffin*, 2 A.3d 1070, 1076 (D.C. 2010) (citation omitted); *see also Holzsager v. D.C. Alcoholic Beverage Control Board*, 979 A.2d 52, 57 (D.C. 2009); *Giant Food, Inc. v. D.C. Dep't of Employment Services*, 934 A.2d 921, 923 (D.C. 2007).[3]

Here, if the D.C. Act applied to sales occurring before July 18, 2009, it would attach new legal consequences to events completed before the law's effective date. In particular, it could impose damages on franchisors for already completed commercial transactions, and it might also require franchisors to unwind completed transactions. Because of the consequences that would ensue from retroactive application

---

[3] In the D.C. cases, the presumption has been phrased several ways, but for present purposes we find no meaningful difference in the varying formulations. *See, e.g.*, *Nixon v. D.C. Dep't of Employment Services*, 954 A.2d 1016, 1023 (D.C. 2008) ("legislation must be considered as addressed to the future, not to the past unless such be the unequivocal and inflexible import of the statutory terms") (alterations omitted) (quoting *Mayo v. D.C. Dep't of Employment Services*, 738 A.2d 807, 811 (D.C. 1999)); *District of Columbia v. Gallagher*, 734 A.2d 1087, 1093 (D.C. 1999) ("well-established rule" that statutes "are not to be given retroactive effect . . . unless the legislative purpose so to do plainly appears") (citation omitted); *Redman v. Potomac Place Associates, LLC*, 972 A.2d 316, 319 n.4 (D.C. 2009) ("well-settled principle that retroactive applications of legislation are not to be presumed absent express legislative language or other clear implication that such retroactivity was intended").

Under D.C. law, statutes that implement procedural changes generally apply retroactively to events completed before their effective dates even absent a clear legislative showing favoring such a result. *See, e.g.*, *Lacek v. Washington Hospital Center Corp.*, 978 A.2d 1194, 1197-98 (D.C. 2009).

of this Act, we must apply the D.C. presumption against retroactivity. Under the presumption against retroactivity, the D.C. Act cannot apply to sales before July 18, 2009, absent a clear showing that the Council intended retroactive application. There is no such clear showing.

To overcome the presumption against retroactivity, Metroil relies heavily on the Act's language that it "shall not apply to any sale of leased marketing premises made pursuant to a contract which has been executed by duly authorized representatives of the parties prior to April 1, 2009." D.C. CODE § 36-304.15 (expired Jan. 1, 2011). From that clear statement of *non*-retroactivity as to sales before April 1, 2009, Metroil asks us to infer that the Act was intended to apply retroactively to sales after April 1, 2009, but before the Act's effective date of July 18, 2009. The problem for Metroil is that the Act does not say or otherwise indicate that it applies to sales made before the Act's effective date of July 18, 2009. A mere inference from the Act's clear statement of non-retroactivity does not constitute the "clear showing" necessary to overcome the presumption against retroactivity. Stated more directly, we do not discern in the text of the law a clear legislative intent that the Act apply retroactively to sales in the interim between April 1, 2009, and July 18, 2009.[4]

---

[4] The April 1 date was inserted into the legislation for the stated reason of avoiding potential constitutional problems in upsetting settled expectations with respect to contracts that were executed before the Committee voted on the bill on April 2. *See* Committee on Government Operations and the Environment, Council of the District of Columbia, Report on the Retail Service Station Amendment Act of 2009, Bill 18-89, at 10 (Apr. 2, 2009); *see also* U.S. CONST. art. I, § 10, cl. 1. But there is no indication of an affirmative legislative intent that the Act apply retroactively to

Metroil also points to the Act's legislative history. Putting aside the question of the extent to which legislative history may inform the retroactivity analysis under D.C. law, the Act's legislative history falls far short of a clear showing in favor of retroactivity. As Metroil notes, Council Member Cheh expressed an "urgent need for the legislation." Committee on Government Operations and the Environment, Council of the District of Columbia, Report on the Retail Service Station Amendment Act of 2009, Bill 18-89, at 9 (Apr. 2, 2009). But a general sense of urgency for legislation is far from a clear showing in favor of *retroactive* application of that legislation.

Metroil also cites the subsequent *unenacted* Cheh Emergency Resolution as support for retroactive application of the Act. That Resolution would have applied the D.C. Act retroactively to sales between April 1, 2009, and July 18, 2009. But the story of this proposed Resolution actually undermines Metroil's position. To begin with, the Resolution did not pass, suggesting if anything that the necessary super-majority of the D.C. Council did *not* believe that the Act should apply retroactively to sales between April 1, 2009, and July 18, 2009. Moreover, although we must be cautious about reading too much into failed legislative proposals, the fact that Council Member Cheh felt the need to propose the subsequent Emergency Resolution suggests that she (correctly) feared that, absent this supplemental law, the original legislation would not apply retroactively to Exxon's June 2009 sales, including the sale to Anacostia.

---

sales before the Act's ultimate effective date (which turned out to be July 18, 2009).

12

In sum, the text and history of the Act do not demonstrate the requisite clear intent that the Act apply retroactively. Therefore, because Exxon sold the service station to Anacostia in June 2009 – before the Act's effective date of July 18, 2009 – the Act did not give Metroil a right of first refusal with respect to this sale.

III

Metroil next argues that Anacostia failed to renew the franchise relationship in violation of the federal Petroleum Marketing Practices Act.[5]

The Petroleum Act provides that motor fuel franchisors may terminate a franchise agreement or fail to renew a franchise relationship only in limited circumstances. *See* 15 U.S.C. § 2802; *see also Mac's Shell Service, Inc. v. Shell Oil Products Co.*, 130 S. Ct. 1251, 1254 (2010). The Act thus affords gas station franchisees federal legal protection beyond that granted by state contract law.

The threshold Petroleum Act question in this case is whether Anacostia failed to renew the franchise relationship. As defined by the Petroleum Act, a failure to renew is "a failure to reinstate, continue, or extend the *franchise relationship* . . . at the conclusion of the term, or on the

---

[5] Metroil initially argued that Exxon, not just Anacostia, also failed to renew the franchise relationship in violation of the Petroleum Act. However, at oral argument, Metroil acknowledged that if Exxon's assignment to Anacostia was valid, then only Anacostia had an obligation to renew the franchise relationship under the Petroleum Act. *See* Tr. of Oral Arg. at 40-41. Because Exxon's assignment to Anacostia was valid, we address only Anacostia's alleged failure to renew the franchise relationship.

expiration date, stated in the relevant franchise." 15 U.S.C. § 2801(14) (emphasis added). The obligation to renew goes to the "franchise relationship," not to the franchise contract. A "franchise relationship" consists of "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." 15 U.S.C. § 2801(2). As that definition reveals, a franchise relationship results from a franchise – that is, from a "'contract' that authorizes a franchisee to use the franchisor's trademark, as well as any associated agreement providing for the supply of motor fuel or authorizing the franchisee to occupy a service station owned by the franchisor." *Mac's Shell*, 130 S. Ct. at 1255; *see also* 15 U.S.C. § 2801(1). Those three specified responsibilities of the franchisor – authorizing use of the trademark, supplying fuel, and authorizing use of the station – thus constitute the three statutory pillars of a franchise relationship.

Because the statutory requirement for renewal applies to franchise *relationships*, not to franchise *contracts*, a franchisor is not required to renew an expiring franchise contract under all the same terms and conditions as the original contract. As the Senate Report accompanying the Act explained, the statute "requires renewal of the relationship between the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement." S. REP. NO. 95-731, at 30 (1978).

To meet its obligation of continuing the "franchise relationship," the franchisor thus must continue to provide the three statutory pillars of the franchise relationship: The franchisor must continue to authorize use of the franchisor's trademark, to supply fuel to the franchisee, and to authorize

the franchisee to use the station. To allege a failure to renew a franchise relationship, a franchisee must allege that it is unable to use the franchisor's trademark, to obtain the franchisor's motor fuel, or to use the franchisor's service station. *See Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 860 (7th Cir. 2002) ("when a franchisee alleges that a franchisor has 'failed to renew' the parties' franchise relationship, . . . it must demonstrate that at least one of the three essential components of a petroleum franchise has been discontinued").

In this case, however, Metroil acknowledges that it still uses Exxon's trademark, obtains Exxon motor fuel, and uses the service station in question. Therefore, Metroil has not alleged sufficient facts to show that there was a failure to renew the franchise relationship, much less that there was an unlawful failure to renew. For that reason, Metroil's Petroleum Act claim was properly dismissed.

IV

Finally, Metroil argues that Exxon's assignment to Anacostia violated a D.C. Code provision that states: "[U]nless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would . . . increase materially the burden or risk imposed" on the non-assigning party by the "contract, or impair materially" the non-assigning party's "chance of obtaining return performance." D.C. CODE § 28:2-210(2).

Metroil claims that Exxon's assignment to Anacostia materially increased the burden or risk on Metroil because Anacostia has charged "excessive prices for motor fuel" and "insisted on obtaining access to Metroil's bank account."

Metroil Br. 36. However, the original franchise contract itself stated that prices were "subject to change . . . at any time and without notice," J.A. 186, and that the method of payment could include automated direct debit "or any other method as . . . designate[d] from time to time," J.A. 187. The franchise contract also provided that Exxon could assign any or all of its rights or interests, without restriction, to any person or entity. Finally, in the franchise contract, Metroil expressly acknowledged that an assignment by Exxon could affect Metroil's rights and obligations under the agreement to the extent an assignee had policies or programs different from Exxon's. Higher prices and direct debiting by the franchisor were thus anticipated and permitted by the original franchise contract; the assignment did not materially increase the burdens or risks for Metroil with respect to those issues. Courts interpreting other states' similar code provisions have come to similar conclusions. *See, e.g.*, *Clark v. BP Oil Co.*, 137 F.3d 386, 393 (6th Cir. 1998); *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 907-08 (7th Cir. 1997); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 924-25 (6th Cir. 1989).

Metroil also contends that Anacostia could not adequately perform its obligation under the assigned contract because Anacostia competes directly with Metroil and lacks the significant financial assets of Exxon. Of course, the assigned contract expired on July 31, 2009, shortly after the assignment. In any event, Metroil's allegations on this point rely on mere speculation and do not suffice to state a claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[6]

---

[6] On appeal, Metroil argues that Exxon, aware of Anacostia's inability to perform adequately, assigned the contract to Anacostia

16

\* \* \*

We affirm the judgment of the District Court.

*So ordered.*

---

in bad faith. However, Metroil did not assert that claim in its complaint, and we therefore do not consider it.